## KLINE v. UNITED STATES.

### Civ. A. No. 814.

United States District Court
S. D. Texas, Brownsville Division.

March 24, 1953.

Paul G. Greenwood, Harlingen, Tex., for plaintiff.

Brian S. Odem, U. S. Atty., and Jack D. Childers, Asst. U. S. Atty., Houston, Tex., for defendant.

ALLRED, District Judge.

Action under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., by plaintiff Kline against the United States for damages for the loss of his boat, The Roxy, allegedly caused by negligent or wrongful acts or omissions of employees of the United States Engineers and the Coast Guard. In view of the disposition herein made, it will be unnecessary to discuss the Government's motion to dismiss on jurisdictional grounds—that this should be by proceeding in Admiralty rather than under the Tort Claims Act—which was overruled and carried along with the case. Trial was to the court without jury as provided by the statute. At the close of plaintiff's evidence, defendant moved for judgment, which was granted.

The Court stated at the time that the decision was based upon a finding that plaintiff's negligence was the sole cause of the loss of the Roxy and that no finding would be made at this time as to alleged negligence by employees of the Government. Upon further consideration in preparing this memorandum, as findings of fact and conclusions of law, however, I have determined to pass on these fact issues also.

The Roxy was lost shortly after midnight of April 17, 1952, occasioned by its running aground on submerged rocks at or near the

narrow entrance of the jetties forming the Brazos Santiago Pass, a seaway entrance from the Gulf of Mexico to Port Isabel and Port Brownsville, Texas. Plaintiff contends that destruction and loss of the vessel was due to absence of the range lights which served as a guide by which to navigate the Brazos Santiago Pass traveling East to West; that the light had been destroyed prior to the accident by the negligence, wrongful act or omission of defendant's employees and by failure to replace it; and that such negligence, wrongful act or omission was the proximate cause of the accident.

Defendant admits absence and destruction of the light; and failure to rebuild it, denies this was the proximate cause, and contends the accident was solely due to negligence on the part of plaintiff.

The parties stipulated that on Jan. 5, 1952, the U. S. Engineers Dredge J. J. McKenzie collided with and destroyed the Brazos Santiago Front Range Light (Fixed Red) located at the West end of the Pass, which had not been repaired or replaced at the time of the Roxy's departure to sea on April 8th or its return on the night of April 17, 1952.

The Roxy was a sub-chaser, purchased by plaintiff and converted to a shrimp trawler. It left Port Isabel on the afternoon of April 8, 1952, on a shrimping voyage. The crew consisted of the owner-plaintiff Kline, as master, and Alvin Booth and George Robles as deck-hands. Also aboard was a Miss Bonnie Davis, who served as cook, and Alvin Booth's young wife, as a passenger. Departure was from Port Isabel via the ship channel to a point on the west end of Brazos Santiago Pass, at which point a course due East leads through the Pass and the jetties guarding the East entrance of the Pass. Beyond lies the open sea.

Two range lights had been established at the west end of the Pass in 1934, rebuilt in 1945 and 1951. They consisted of the Fixed Red Front Range light of 2500 candle power thirty feet above water and a Fixed Green Rear Range light of 3500 candle power and fifty-six feet above water. These served as navigational aids and were so placed that, when lined up, entry through the pass would follow the middle and deepest part of the channel. These lights were charted by the U. S. Coast and Geodetic Survey.

As stipulated, the Front Range light had been destroyed about three months before departure of the Roxy on the afternoon of April 8, 1952. Plaintiff testified that, when passing the point at which the lights were situated on the outbound trip, he did not notice absence or destruction of the light because of the presence of a dredge or other vessel which obstructed his view, and that he had not learned of the destruction of the range light. I find this difficult to believe. I do not see how any average seaman could fail to notice the crumpled towers, upon which the light had been mounted, from a boat passing in broad daylight as near as did The Roxy on its outbound trip.

The voyage continued for several days and shrimping operations were halted due to loss or destruction of nets. The boat then engaged in snapper fishing until its return on the 17th and 18th of April. The boat had lost all but one anchor while on the trip and was returning to port by compass and fathometer.

Kline testified that the night of April 18th was "dark and clear" and that the sea buoy on the East, marking the approach to the Brazos Santiago Pass, was sighted from a distance of five miles; that the sea buoy was a flashing white light with a height of eight or ten feet and that at most times he had been able to see the range lights from that point. He estimated the distance from the sea buoy to the range lights as about five nautical miles (although in fact it is somewhat farther).

Turning west at the sea buoy, as usual, the Roxy approached the Pass, which was marked at the jetty entrance by a flashing red light on the starboard and a flashing green light on the port. When the range light was in operation, it could be seen from the buoy and the buoy light could be used as a rear lining up point for safe passage between the jetties. On this occasion, however, Kline could not, and did

not, see the range light although he looked for it before entering the Pass.

Kline estimated the distance from the sea buoy to the jetty entrance at about two nautical miles: the jetties about twelve hundred feet apart; the channel thirty feet deep and six hundred feet wide. As Kline entered the jetties he saw the flashing red and green lights marking the jetties and says he thought he saw the fixed green range light, but was not sure. Prior to going into the channel, however, Kline, who was in charge of the wheel, had a discussion with his deck-hand Alvin Booth regarding their not seeing the range lights. Kline wanted to wait until morning and daylight before going in, but, to use his own words, "Booth sold me a bill of goods," so he decided to go on in. I am convinced that he either knew the range lights had been destroyed; or, if he did not know, he knew something was wrong since he could not see them and decided to take a chance which he knew was dangerous.

A Coast Guard Station was located nearby. Kline made no effort to contact them by radio when he and Booth discussed their inability to see the range lights, although he radioed them after the Roxy grounded on the rocks. He had made no attempt to get on the "Notice to Mariner's" list so as to keep abreast of information as to range lights, and other aids to navigation, etc. He did not listen regularly to broadcasts of information concerning "outages" of aids to navigation in the area.

While Kline testified to long experience as a navigator, who had been in and out of Santiago Pass hundreds of times, his difficulty in reading charts on the trial, amounting almost to an inability to read them correctly, as well as other circumstances, cause me to doubt his qualifications. All of these factors, added to his unfortunate decision to take the chance when Booth "sold" him "the bill of goods" and caused him to edge out of the channel too far to the north where the Roxy struck the submerged rocks. It could not be dislodged and sank in a short time. Fortunately those aboard were rescued by the Coast Guard.

Plaintiff says the Government was negligent in the following respects: (a) the U. S. Engineers collided with and destroyed the range lights; (b) both the Engineers and the Coast Guard failed to replace it; and (c) the Coast Guard failed to mark the submerged rocks near the north end of the jetty upon which the Roxy foundered.

The range lights in question were established, maintained and operated (until their destruction) by the Coast Guard under authority of 14 U.S.C.A. § 81, which provides in part:

> "In order to aid navigation and to prevent disasters, collisions, and wrecks of vessels * * * the Coast Guard *may* establish, maintain, and operate: (1) Aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States; * * *." (Emphasis supplied.)

Section 84 of Title 14 makes it a penal offense for any person, public body or instrumentality, "*excluding the armed forces*," to remove, change the location of, obstruct, willfully damage, make fast to or interfere with any such aid to navigation. Since the United States Engineers are a part of the armed forces, there could be no liability, under this section, for colliding with and destroying the range lights unless the provisions of the Federal Torts Claims Act, making the government liable in the same manner and to the same extent as a private individual, operates to repeal or remove the exemption of the armed forces. The Federal Torts Claims Act was enacted June 25, 1948. Section 84 of Title 14 was re-enacted August 4, 1949. It is based upon old Title 33, §§ 761, 762, which omitted the exemption. Being the latest expression of the will of Congress, and containing the exemption, it controls. So there can be no "negligence per se" on the part of the U. S. Engineers for violation of the criminal statute, if it was violated.

Although no evidence was introduced as to the circumstances or conditions under which the Engineers Dredge J. J. McKenzie collided with and destroyed the range lights, plaintiff's counsel urged on

oral argument that the Government was negligent under the doctrine of res ipsa loquitur. I cannot see it.

The U. S. Engineers were under no obligation to restore or maintain the range lights. As shown by that portion of the statute first above quoted, the Coast Guard had the discretion, originally, as to whether the range lights should be established and *maintained*. Plaintiff's counsel says, however, that having exercised this discretion [1] by establishing and maintaining the range lights, the Coast Guard was under an obligation to continue to maintain them, irrespective of the fact that they had been destroyed without fault, so far as the record shows. In any event, I think the Coast Guard had an equal discretion, after the lights were destroyed, to determine whether, when and how they should be restored; and as to the proper steps to take in the interim to advise or warn vessels of their not being in operation. Even if the Coast Guard had determined to restore the lights, their failure to do so within three months would not constitute negligence. Government departments sometimes experience difficulties and delays in getting appropriations even for emergencies; and in drawing specifications, advertising for bids, letting contracts and getting a job done, even after appropriations have been made. There is absolutely no evidence that the Coast Guard did not take adequate steps during the interim to advise the seafaring public, including plaintiff, as to the range lights not being in operation.

Plaintiff pitches his entire case upon Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631, where the Government was held liable for negligent marking of the wreckage of the old battleship Texas in Chesapeake Bay. But there the court held that the duty to mark and remove the wreck was *mandatory* under the Wrecks Act, 33 U.S.C.A. § 409; that, even if the marking was discretionary, once that discretion was exercised, there is liability for negligence

in marking; and that the Government was negligent by its long delay in removing the wreck, and in placing the marker 525 feet away from the wreck. Here the facts are altogether different. There was no long delay, even if the Coast Guard was under duty to replace the lights. There is no evidence of any negligent acts or omissions on the part of the Coast Guard after the range lights were destroyed. Even if it had been its duty to replace the lights, there is a vast difference in replacing, on mud-flats or a sand bar, or in the water, the type of heavy construction upon which the lights were mounted, and the planting of a buoy at the site of a wreck.

I have been pointed to no statute or decision requiring the Coast Guard to mark the submerged rocks. Plaintiff admits that the entrance to the jetties was marked with green and red lights; that the sea buoy east and center of the channel was a flashing white light upon which he could have lined up with the range lights, if he had seen them, and kept right down the middle of the channel. I think his testimony shows he knew the rocks were there and tried to avoid them after he got into trouble.[2]

From all the foregoing I find that there is no evidence of negligence on the part of either the Coast Guard or the Engineers, or that any negligent act on their part was a proximate cause of the loss of the Roxy. I further find that when plaintiff entered the channel without having sighted the range lights, under all the facts heretofore enumerated, he did so at his own peril, and that such negligence was the sole proximate cause of the loss of the Roxy.

Alternatively, I find that plaintiff was guilty of contributory negligence in all respects heretofore enumerated and that such contributory negligence was a proximate cause of the loss of the vessel.

For the record, I find the value of the Roxy and the amount of plaintiff's damage to be $20,000.

---

1. Citing Costley v. United States, 5th Cir., 181 F.2d 723, 726, where the Government was held liable for negligence in treating a sergeant's wife who had been admitted to a service hospital. The Court held that the Army had exercised its discretion by accepting her as a patient.

2. Cf. United States v. Bowers, 5 Cir., 202 F.2d 139.

Judgment will be for defendant. The foregoing is adopted as findings of fact and conclusions of law.

The Clerk will notify counsel to submit an order accordingly.