Charles **HAMBURGER**, to his own use and to the use of the Home Insurance Company; and Alan M. Wolf, Gert Rosenthal, and Melvin Coblenzer

v.

**UNITED STATES of America.**

Civ. No. 19889.

United States District Court,
D. Maryland.

Sept. 10, 1970.

Alva P. Weaver, III, Baltimore, Md., for plaintiffs.

Walter G. Pratt, Washington, D. C., for defendant.

THOMSEN, District Judge.

This suit arises out of the collision on May 1, 1968, of a cabin cruiser, the CAR–ANN IV, owned and operated by the plaintiff Hamburger, with the submerged remains of Spry Island Shoal Light No. 2. The boat sank, and Hamburger and his insurer have a claim for property damage. His passengers, the plaintiffs Wolf, Rosenthal and Coblenzer, have small claims for property damage and personal injuries.

Spry Island Shoal Light No. 2 was located in 12 feet of water east of the mouth of Middle River and south of Weir Point, which is at the western end of the mouth of Gunpowder River. See C. & G.S. Chart 549 (Approaches to Baltimore Harbor). The light as originally constructed had four steel piles, which rose above mean high water, cross members and a ladder, with a red triangular daymark on the pile structure and a quick-flashing red light. Sometime during the winter of 1967–1968, the structure was severely damaged by ice. This was discovered by the Coast Guard on January 19, 1968. At that time, the remains consisted only of four steel piles, which stood 1.5 feet above high water and were considered a menace to navigation. The Coast Guard marked the remains with a red buoy. The destruction of the light and the marking of the remains were included in a safety broadcast and were published in the *Fifth Coast Guard District Local Notice to Mariners* on January 23, February 6 and February 13. On March 20 the piling was completely submerged at low water and still considered a menace to navigation. On that date the remains were marked with a red and black band-

ed buoy. A single safety broadcast was given sometime during that day. On the following day (March 21) the Coast Guard removed the red and black banded buoy and replaced it with a quick-flashing, red buoy located 25 yards 290° from the remains, on a 45 foot cable with a 12 foot bridle. This was reported in a safety broadcast on March 21, and on March 26 was printed in the *Fifth Coast Guard District Local Notice to Mariners No. 13*.[1]

The red flashing buoy placed on March 21 was the proper way of marking the obstruction. See *Light List, Vol. 1, Atlantic Coast, 1968,* pp. XVII et seq., and *Aids to Marine Navigation of the United States (C.G. 193)*, pp. 17–22, both published by the Coast Guard, and *Nautical Charts, Symbols and Abbreviations,* published by the United States Naval Oceanographic Office. The distance of 25 yards from the remains was as close as was practicable without running the buoy tenders upon the obstruction. A red and black buoy would have permitted passage on either side of the buoy, whereas the red buoy indicated that one entering Middle River or Gunpowder River should pass the buoy on his starboard hand.

The Coast Guard did not remove the remains until after May 1, because such removal was beyond the capacity of the buoy tenders and there was some difficulty in finding a contractor to do the work.

On March 27 a cabin cruiser belonging to the Johns Hopkins University collided with the submerged remains of the Spry Island Shoal Light No. 2 and sank. The Coast Guard knew of this accident.

Hamburger had been familiar with the waters of the Upper Chesapeake Bay for 20 years, and testified that he did not use a chart or read the *Notice to Mariners*. He had seen Spry Island Shoal Light No. 2 during the fall of 1967. During the winter he kept his boat at a dock in Middle River, but had taken one or two trial runs to the mouth of Middle River between April 15 and May 1.

On May 1 Hamburger and the other three plaintiffs, who were old friends, went across the Upper Chesapeake Bay to a marina on Worton Creek on the Eastern Shore, across from the Aberdeen Proving Grounds. On the way over Hamburger did not notice the buoy where the Spry Island Shoal Light No. 2 had been located. The plaintiff Wolf had obtained up-to-date charts from a congressman that spring and had given one of the charts to Hamburger. Wolf also subscribed to *Notice to Mariners* but did not remember reading about the destruction of the Spry Island Shoal Light No. 2. He testified as an expert on lights, but his claimed knowledge was contrary to the established practice.

After an early dinner plaintiffs left the Worton Creek marina, and proceeded southwesterly · along the channel until they passed Poole Island. Hamburger then set his course about 295°, roughly WNW, keeping the buoy on his starboard side and attempting to pass it at a distance of some 50 feet. While passing the buoy the CAR–ANN IV hit one of

---

1. The notice read:
"MARYLAND—CHESAPEAKE BAY —UPPER PART—Aid destroyed. Temporary buoy discontinued. Obstruction buoy established.
"a. SPRY ISLAND SHOAL LIGHT 2 (LL 3940.11) located at position Latitude 39° 16′ 46″ North, Longitude 76° 20′ 03″ West has been destroyed with portions of the old structure remaining five feet below mean high water. The temporary unlighted buoy previously established has been discontinued.

"b. SPRY ISLAND SHOAL OB-STRUCTION LIGHTED BUOY 2 (LL 3940.12) painted red and showing a quick flashing red light has been temporarily established 25 yards, 290° True from the above position.
"Mariners are advised to exercise caution when transiting that area.
"C&GS Charts 549, 549–SC, 1226
"C&GS Coast Pilot 3, 1966, Page 152
"LNM 6–68, CG Portsmouth, 6 February 1968"

the piles and sank within three to five minutes. Hamburger sent out the following radio message: "Mayday! Mayday! Mayday! I am Sinking off Red Buoy Two Millers Island." They were rescued a little over an hour later.

The property damage, covered by insurance, was $12,501.75. Hamburger claims additional property damage of $5,044.31. The Government disputes this amount, but it is approximately correct. In the complaint, Wolf claimed $1,000 damages, Rosenthal $3,000, and Coblenzer $3,000. Wolf proved no damages, except $25 property damages and whatever nominal amount might be allowed for spending an hour or so in the water. Rosenthal sustained a slight injury to his head, had property damages and medical expenses of $316.50 and lost two weeks from work at $250 a week. Coblenzer had property damage of $200 and medical expenses of $35.50 for an injury to his shoulder, which he said still prevents his playing golf.

■ After the Spry Island Shoal Light No. 2 was destroyed, the Government had the duty to mark or to remove the remains and to do so carefully. Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Kline v. United States, 113 F. Supp. 298 (S.D.Tex.1953). See also Somerset Seafood Company v. United States, 193 F.2d 631 (4 Cir. 1951); Columbia Dredging Corporation v. N. Y. P. & N. R. Co., 46 F.2d 988 (4 Cir. 1931).

■ The Court finds that the Government marked the remains carefully and properly. See the Coast Guard *Light List* and *Aids to Marine Navigation*, cited above. The buoy was located as close to the submerged piles as was practicable. The *Light List* states, at p. XX:

"Buoys marking wrecks. Buoys established by the Coast Guard to mark wrecks are generally placed on the seaward or channel side of the wreck and as near to the wreck as conditions will permit. Caution must be exercised when navigating in the vicinity of buoys marking wrecks because, due to sea action, the wreck may shift in location between times that the buoy is established and later checked or serviced."

And at p. XIII it states:

"The idea seems to have developed among the more uninitiated that a wreck buoy always occupies a position directly over the wreck it is intended to mark. *This idea is entirely erroneous.* Buoys must be placed in position by a vessel. It is usually physically impossible for these vessels to maneuver directly over a wreck to place the sinker without incurring serious underwater damage to themselves. For this reason, a wreck buoy is usually placed on the seaward or channelward side of a wreck, the proximity thereto being governed by existing conditions. * * *"

The Government also gave due notice by broadcast and by its printed *Notice to Mariners*. The delay in removing the remains was not unreasonable under the circumstances.

■ The proximate cause of the accident was the negligence of the plaintiff Hamburger. If he was familiar with the area, as he says he was, he should have noticed the absence of Spry Island Shoal Light No. 2. At the time of the accident he did not know that a quick-flashing, red, lighted buoy could mark an obstruction, and he assumed that the buoy was placed there only as a navigational aid. Acting on that assumption, and without referring to his charts or making any other inquiries, he attempted to pass the buoy on a northwesterly course, 50 feet or so from the buoy. Such buoys necessarily change their position to some extent with current, tide and wind, and Hamburger should have known that it was signaling danger. He was approaching the red buoy from the southeast, which was a dangerous quadrant to approach that buoy, since the channel which the series of Spry Island buoys marked was a north-south channel inbound from the sea.

Moreover, however familiar he may have been with the waters in general, Hamburger was negligent in crossing the Bay for the first time that year without checking the chart or the *Notice to Mariners*. Whether a mariner is negligent in failing to keep up with the *Notice to Mariners* depends upon the circumstances of the case. Cf. United States v. Travis, 165 F.2d 546, 548 (4 Cir. 1947); Standard Dredging Corp. v. SS Syra, 290 F.Supp. 260 (D.Md.1968); Sisser v. C. J. Langenfelder & Sons, Inc., (unreported), Admiralty No. 4953 (D.Md.1967); Davidson S.S. Co. v. United States, 142 F. 315, 318–319 (8 Cir. 1905), aff'd 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 764 (1907); Placid Oil v. SS Willowpool, 214 F.Supp. 449, 453–454 (E.D.Tex.1963); Continental Oil Co. v. M/S Glenville, 210 F.Supp. 865, 870 (S.D.Tex.1962). In this case the failure was negligence, especially since it was coupled with the failure to consult an available chart. The Court concludes that if Hamburger had exercised reasonable care, he would not have hit the obstruction which the buoy was marking.

Judgment will be entered in favor of the defendant.