**CABINS TANKER INDUSTRIES, INC.,** owner of the Steamship **THE CABINS,** and **Terminal Tanker Industries, Inc.,** bareboat charterer, as its interest may appear, Libellants,

v.

**M/V THE RIO MARACANA,** her engines, etc., in rem and Compania Nacional De Navegacao Casteriro Patrimonio, her owner, in personam, Respondents.

No. 7793.

United States District Court
E. D. Virginia,
Norfolk Division.
March 8, 1960.

812

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for libellants.

Vandeventer, Black & Meredith, Norfolk, Va., for respondents.

WALTER, E. HOFFMAN, District Judge.

In cross-libels we are called upon to determine the responsibility for a collision between the Cabins, hereinafter referred to as "Cabins", and the Rio Maracana, hereinafter referred to as "Rio", which occurred in the general vicinity of the Maryland Pilot Boat at approximately 2106 on November 16, 1956, when off the Cape Henry light.

The Cabins is a T-2 type tanker of 10,172 gross and 6,134 net tons. She is

523.6′ in length, 68.2′ in breadth, 30.2′ in depth, and at all times pertinent had a mean draft of approximately 30′, being loaded with a cargo of gasoline and heating oil.

The Rio is a dry cargo carrier of Brazilian registry, sometimes referred to as a C1–M–AVI type vessel, of 5,100 gross and 3,806 net tons. She is 338.5′ in length, 27′ in breadth, 23′ in depth, and at all times pertinent had a draft of 4′ forward and 14′ aft, being light with no cargo in her holds.

■ Vessels approaching the point of collision are, in most instances, required to stop or slow down for the purpose of taking on or discharging pilots. Those vessels going to, or coming from, Baltimore approach the Maryland Pilot Boat. Ships going to, or coming from, the Port of Hampton Roads, including Norfolk, Portsmouth, South Norfolk, Newport News, Yorktown and Richmond, approach the Virginia Pilot Boat. At each Pilot Station there are qualified pilots, experienced with Inland waters, who take over the particular vessels and pilot same. The vessel and its owners nevertheless remain liable for the acts of the pilot boarding same.

On the night in question, with weather clear, sea smooth, visibility good, a slight current, and the wind approximately SSE at a velocity of 10–12 miles per hour, the Rio was inbound through the Virginia Capes en route to Hampton Roads. After departing the sea buoy ("2CB") off Cape Henry, she directed her course in the direction of the Virginia Pilot Boat to pick up her pilot as required by law. Just prior to reaching the rendezvous point for the pilot, the Rio experienced difficulty with the engines due to water in the fuel. The vessel anchored at approximately 2035. A few minutes later the pilot came aboard and, after some discussion, advised the Rio's master that the vessel was anchored in an area designated as restricted by the United States Coast Guard, and that the vessel would be subjected to a penalty unless moved from its then location. Acting under the pilot's orders the anchor was heaved, and the vessel drifted on the tide and wind from her southeasterly heading, to her left in a semi-circle to a general northerly heading away from the restricted area and directly toward the path of the Cabins.

■ We entertain no difficulty in condemning the navigation of the Rio. The decision to raise her anchor at a time and place which, to the knowledge of her pilot, would undoubtedly permit the Rio to drift into the path of an oncoming vessel is, without more, sufficient to convict her of improper navigation. Indeed, one need only look to the testimony of the Rio's pilot to denote the manifest errors committed. Before leaving the pilot boat, he knew that the Cabins would be approaching buoy "2A" to pick up a Maryland pilot. After boarding the Rio he could see all of the Cabins' regulation lights at a distance of 2½ to 3 miles. The Cabins made no appreciable change in her course approaching the pilot boat. The pilot was likewise aware of the fact that the Rio, if permitted to drift, would cross the intended path of the Cabins. His only defense is that he was advised, according to his testimony, that the engines would be started in five minutes, whereas, in fact, they were not in operating condition until 2143—approximately 48 minutes after the Rio weighed anchor and started to drift. True, the pilot was confronted with a language barrier as he was only able to communicate with the Rio's master through the second officer who spoke English "after a fashion", but this is all the more reason why the pilot should have exercised caution in giving orders. That confusion existed cannot be doubted when we note that the Rio's master claimed that he told the pilot that the engines would not be ready for 30 minutes and the second mate informed the pilot that the time would be from 15 to 20 minutes. With full appreciation of the necessity of avoiding a penalty for anchoring in a restricted area, it was, at best, a foolhardy act to permit an out-of-command vessel to be subjected to such a danger

when, in fact, the penalty could have been enforced in any event as the anchor was already down. The pilot admits that if there had been other vessels nearby, he would not have permitted the Rio to drift. In short, he was willing to take a chance with one approaching vessel, but not with more than one.

Aside from any discussion of out-of-command lights, no flares, blinkers or whistles were used by the Rio in an effort to warn the Cabins of any impending danger. The pilot attempted to blow a whistle approximately four minutes prior to the collision but, due to engine difficulties, the whistle was inoperable. He made no effort to ascertain whether there were other available whistle controls or signal lights until after the collision, at which time he learned that there were manual controls overhead which were readily operable, and a Morse light was equally handy. He did not ask whether there were flares aboard, and brushes off this inquiry by stating that he had assumed that there would be no need for same. There was insufficient time, according to the witnesses, to effectively use the blinker or searchlight, although it undoubtedly could have been put in use if caution had been exercised in sufficient time as the pilot frankly admits.

As the Rio made no notation of times, other than when the pilot boarded the vessel at 2040 and the engines again commenced to function at 2143, it is difficult to fix the pertinent times as related to her activities. Certainly it cannot be seriously urged that the anchor was aweigh at 2043 as testified to by the master, chief mate, and others. It is a fair assumption that, with the language barrier existing, a few minutes were spent in conversation and, according to the pilot and second mate, it was a matter of 8 or 9 minutes after they commenced heaving before the anchor was aweigh. An appropriate estimate of the time when the anchor was aweigh is 2055 or 2056.

The Rio's pilot described the course of the vessel by stating that she "spun around like a top" after the anchor was up. The head swung around to a NNE heading, and commenced drifting towards the northwest. By reason of its light draft, the heading from south to north was accomplished in approximately 2 to 3 minutes. The Rio's chief officer was almost immediately aware of the danger as he stated that, after receiving orders to heave the anchor:

"Then I saw the other ship coming in our direction. Three times I told the captain that a collision would soon occur and finally it happened."

Whether this warning, given in a foreign tongue, was communicated to the pilot is unknown, but it is a clear indication of negligence on the part of the officer personnel.

A sharp conflict exists with respect to the Rio's lights. When the pilot boarded the vessel at approximately 2040, the anchor lights were displayed. The time required to put the so-called "out-of-command" lights in place, as described by the Rio's witnesses, is incredibly short. Initially, according to the witnesses, red kerosene lanterns were raised. Such lights are not, of course, a part of the vessel's fixed lights. They were taken to a halyard above the bridge, attached to the halyard, lighted, and then hauled approximately 15 or 30 feet above the bridge. The pilot even assisted in lighting one of the lights—a menial task for one charged with the safety of the vessel.

Three minutes after the red kerosene lanterns were in place, the Rio's master ordered that the kerosene lanterns be replaced with electric elements, thus requiring the services of an electrician who was not a part of the bridge complement. The time required for these procedures would not indicate that the anchor was aweigh at 2043, or at any time reasonably close thereto.

With her full running lights displayed indicating that she was "under way" and, according to the Rio's witnesses, with two red lights prominently exhibited revealing an "out-of-command" vessel, the vessel drifted with the wind and tide

and with no further warning until the collision at approximately 2106. The Cabins' master admitted having seen one red light above the Rio's bridge deck house at approximately the same time he observed the green starboard running light which was at or about 2058. The Cabins' chief officer indicated that he had initially seen a single red light that showed up momentarily over the Rio's bridge, but that it thereafter disappeared. The testimony of the Cabins' master is somewhat evasive and contradictory as to what he then did upon seeing the red light and green light. On direct examination he states that this occurred at 2104, only two minutes prior to the collision, whereas he had previously stated at the Coast Guard hearing that he noted the green and red lights at approximately 2058, about eight minutes before the collision. The latter estimate of time appears to be more worthy of belief. It was at approximately 2058 that the Cabins altered her course right to 316° and settled on a heading of 315°, which course she continued to hold until 2103 when she again altered right to 338° and continued on this heading until 2105. At approximately 2105 the full astern bell was given and the Cabins blew a danger signal. This movement caused the bow of the vessel to pull to the right and the stern to fall off slightly to the left. Immediately thereafter the master, in an effort to take the brunt of the blow off the bow of the Cabins, ordered full ahead with a sharp swing to the left which continued on through 270°, and on which the Cabins was at approximately 2110 some four minutes after the collision.

Obviously the master of the Cabins was initially confused when he first saw the green and red lights at 2058 at which time the Rio was in the process of swinging to the north. According to the Rio's testimony the running lights were turned on at or immediately prior to the time that the anchor was aweigh at approximately 2055 which, if correct, constituted a violation of Art. 2 of the Inland Rules, 33 U.S.C.A. § 172, although, in this case, such a violation would only tend to confuse those aboard the Cabins and could hardly be deemed a proximate cause of the collision. Such confusion may, however, tend to explain the action or inaction of the Cabins as her master indicated that he would not have done otherwise even if aware of the fact that the Rio was out-of-command.

The authorities are not clear as to the status of lights to be displayed on vessels in Inland waters when drifting and out-of-command. Rule 4(a) of the International Rules, 33 U.S.C.A. § 145b(a), provides that a "vessel which is not under command shall carry, where they can best be seen, and, if a power-driven vessel, in lieu of the lights required by Rule 2(a) (i) and (ii), two red lights in a vertical line one over the other not less than 6 feet apart, and of such a character as to be visible all round the horizon at a distance of at least 2 miles." The evidence substantially confirms that, in addition to the side lights, the Rio's range and masthead lights were likewise burning at or about the time the anchor was aweigh, and at all times thereafter until the collision. While proctors for the Rio have endeavored to establish a custom indicating that, in Inland Waters, vessels out-of-command will display all running lights, including her masthead and range lights, as well as two vertical red lights, the evidence falls far short of substantiating the existence of such a custom. Griffin on Collision, 1949 Ed., § 253, p. 572. The Inland Rules contain no provision for out-of-command lights. The Pilot Rules, promulgated by the Coast Guard under the authority granted by 33 U.S.C.A. § 157, make certain specific provisions for the use of red lights in a vertical position, under varying circumstances [1] not here pertinent. Confusion is compounded when supposedly capable pilots experienced with Inland and Pilot Rules apparently do not know what full running, masthead and

1. Pilot Rules for Inland Waters—§§ 80.18(b), 80–19(b), 80.20(b), 80.21(b), 80–22(b) (c), 80–23, 80–33(d), 80.33a.

range lights actually signify when vertical red lights also appear. If the Rio had attempted to comply with International Rule 4(a), it is clear that the masthead lights should have been eliminated when the two red lights were allegedly placed in a vertical line one over the other. It is little wonder that the personnel of the Cabins was unable to ascertain the status of the Rio as an out-of-command vessel until it was too late. Especially is this true when only one red light was observed. Nevertheless, the experienced pilot on the Rio, with full knowledge of the fact that Inland and Pilot Rules make no provision for two red lights signifying that the vessel was out-of-command, permitted the Rio to drift with lights that were bound to confuse even the most experienced mariner. Such a situation calls for the application of Art. 1 of the Inland Rules, 33 U.S.C.A. § 171 which states:

"The rules concerning lights shall be complied with in all weathers from sunset to sunrise, and during such time no other lights which may be mistaken for the prescribed lights shall be exhibited."

If, as the Rio's pilot contends, two red lights indicate a vessel not under command, what do the various sections of the Pilot Rules mean to mariners in Inland Waters?

Moreover, there is a serious question as to whether the Rio hoisted two red lights in a proper position. The Maryland pilot boarded the Cabins at 2108, immediately after the collision, although he did not actually see the impact as he was in a launch near the starboard bow of the Cabins. He did, however, hear the sound of the collision. Upon reaching the port wing of the bridge, the Maryland pilot noted that the Rio was either raising or lowering her two red lights. Just prior thereto it was observed that the two red lights were off at an angle, with the lower light more to the starboard and one light very dim. The same pilot likewise saw the masthead and range lights on the Rio. The Cabins'

chief officer testified to the same effect and her master stated that, after the collision, he saw two red lights in a horizontal position above the bridge house, and thereafter saw these same lights hoisted to a vertical position. For what purpose the Rio was changing her red lights is unknown, but it is a proper inference to be drawn from this testimony that, subsequent to the collision, the Rio became cognizant of the fact that the red lights had not been properly located as to visibility. The Maryland pilot likewise accounts for the swing of the Cabins to the left, as her starboard anchor was down when he reached the bridge and this caused the vessel to veer to port to the extent that, after the swing stopped, the Cabins was headed in the general direction of the Cape Henry lighthouse. The testimony of the Maryland pilot is of particular significance as he was not involved in the collision and he appeared to be a totally disinterested witness. He further stated that he had never before observed a drifting vessel with two red lights in Inland Waters.

We must remember that in the area of buoy "2A" it is not unusual for vessels to pass within two ship's lengths of each other. There is a maneuvering radius of approximately one-half mile within which the pilots board the vessels. Assuming, as we must, that the situation calls for the application of Art. 27 of the Inland Rules, 33 U.S.C.A. § 212, relating to special circumstances, the obligation imposed on each vessel was due regard for all dangers of navigation and collision. With the confusing situation created by improper lights, the Cabins could not readily ascertain what the Rio was doing or intended to do. Any warning signal or whistle from the Rio would have perhaps imposed upon the Cabins the duty of going full astern at an earlier time, or in some other manner altering her course to avoid the collision, but, under the circumstances presented, if any fault existed on the part of the Cabins, it would clearly fall within the major-minor fault rule and the liability would remain with the Rio in any event.

The speed of the Cabins was gradually reduced from the time of her arrival at Cape Henry at approximately 2048 when she reduced to maneuvering speed, 70 RPM, 12 knots, until the point of collision. At 2057 and 2058 her speed was reduced to half ahead and slow ahead respectively. At 2101 she went to dead slow ahead. All of these decelerations in speed were made in anticipation of taking on the pilot. Approximately two minutes prior to the collision the Cabins went half astern in the belief that there was then some impending danger. At 2105, she was ordered full astern with the realization that a collision was imminent. It is argued that the Cabins should have gone full astern at 2104 or prior thereto, but again we are dealing with a condition involving maneuvers around a pilot boat with the Rio carrying, at best, confusing lights which quite probably indicated to the Cabins that the Rio was under full command.

While the angle of the impact was nearly 90° with the bow of the Rio striking between the No. 3 and No. 4 tanks of the Cabins just forward of the amidships section on the port side, the blow was not severe and, with the Cabins' movement of hard left, the damage was not too extensive as it resulted in a scraping or brushing action.

The main force of the Rio's argument lies in the course recorder from the Cabins. By the interpretations obtained from the readings by experts, the Rio hopes to invite a division of damage. That the times shown on the course recorder were generally slower than the Cabins' bridge times is not in serious dispute. The question remains as to how much slower. The Court is fully aware of the value of mechanical equipment such as a course recorder, which is not subject to the discrepancies found in the words of live witnesses. It is, however, important to correlate the times and actions shown on the course recorder with the physical facts and other times revealed by the vessel. It seems clear that the course recorder was at least two minutes slower than bridge time as, for example, the course recorder reflects that at 2025 the vessel altered rather sharply to her left from a heading of 330° to a mean heading of 314°. This is at the time the vessel passed buoy "2CB" and the ship's time indicates that this alteration took place at 2028. Again at 2057–2058 ship's time, an alteration of 3° to 4° to the right is shown, whereas the course recorder reports changes as follows:

2052—altered right from 311° to 312° and on this heading until 2054.

2054—altered right to 313° and on this heading until 2056.

2056—altered right to 316° and settled on heading 315° until 2101.

Comparing these times and course changes, bearing in mind that the course recorder demonstrates the actual courses of the vessel and not the compass changes, the conclusion is inescapable that the course recorder was from 2 to 2½ minutes slower than ship's time.

This factor is of importance as the Rio contends that the Cabins swung to port at 2103 (course recorder time), thereby causing the impact. The interpretation of the course recorder indicates that the Cabins "commenced swing to left at about 9:03", but that at 2103 the vessel was on heading 338°, having altered to 338° at 2101. The Cabins contends that the full speed astern action was at 2105, causing the stern of the vessel to veer to the left, and that at 2105¼ the full ahead and hard left rudder order was given. Considering the physical facts and apparent variations in times, the Court accepts the version of the collision as advanced by the Cabins.

While it appears that the Cabins blew a danger signal at approximately 2105, we think that this is of little moment as the Rio was out-of-command in any event. This fact does tend to show that those aboard the Cabins were not aware of the status of the Rio until seconds prior to the impact. Had the Cabins

blown other signals prior thereto, the result would not have been different.

■ The argument is advanced that the engineer of the Cabins was not produced as a witness. Proctors had stipulated that the engine bell book could be produced without further proof. While there are some conflicts between the times shown on the engine bell book and those reflected on the deck bell book, with respect to changes in speed, the presence of the engineer on duty in the engine room would not have materially altered the factual situation as to times deemed pertinent. There were rather substantial variations prior to 2101 but, as of that time, the respective books reveal:

| Deck Bell Book | Engine Bell Book |
|---|---|
| 2101—Dead slow ahead | 2101—Dead slow ahead |
| 2104—Half astern | 2104½—Half astern |
| 2105—Full astern | 2105—Full astern |
| 2105½—Full ahead | 2105¼—Full ahead |
| 2106— | 2106½—Full ahead |
| 2106½—Stop | 2106½—Stop |
| 2108—Dropped anchor | Anchored |

Assuming arguendo, that the engineer on duty was better able to note the times and make the entries than the chief officer of the Cabins, to adopt the times and engine movements as recorded in the engine bell book would not change the result.

■■ Nor do we think it significant that the Cabins did not produce the helmsman or lookout, although it should be noted that efforts were made to have the lookout present. The helmsman could add little, if anything, to what we already know from the course recorder which, as indicated, is far more valuable than the testimony of a witness speaking from memory. As to the lookout, it is possible that he may have observed two red lights on the Rio, but certainly a lookout is not ordinarily required to interpret lights. His function is, in the main, to direct lights to the attention of the officer personnel. We do not believe that any inferences adverse to the Cabins should be drawn in this case by reason of the failure to call as witnesses the lookout, helmsman, chief engineer, or engineer on watch.

We find it unnecessary to determine whether a drifting vessel, such as the Rio, is "under way" within the meaning of Art. 2 of the Inland Rules, 33 U.S.C.A. § 172. Under the provisions of Section 1 of the Inland Rules, 33 U.S.C.A. § 155, it is stated that a vessel is "under way" within the meaning of the rules, when she is not at anchor, or made fast to the shore, or aground. This memorandum has been prepared upon the assumption that the Rio was "under way". The Rio's witnesses obviously concluded that, in the absence of a specific rule governing out-of-command vessels in Inland Waters, the International Rules would apply. Rule 4(d) of the International Rules relating to out-of-command vessels is as follows:

"The vessels and seaplanes referred to in this Rule, when not making way through the water, shall not carry the coloured sidelights, but when making way they shall carry them."

Whether the words "under way" and "making way" are synonymous is not decided. It is clear, however, that if Rule 4(d) aforesaid is applicable, the Rio committed an additional violation tending to confuse the Cabins.

There is reputable authority to the effect that a drifting vessel out-of-command is not required, under Inland Rules,

to display two red lights in accordance with Rule 4(a) of the International Rules and, indeed, the showing of such red lights would be a violation of Art. 1 of the Inland Rules. The Socony No. 115, 2 Cir., 63 F.2d 226. While in the cited case the vessel not displaying two red lights was exonerated, there is abundant evidence of fault on the part of the Rio under the facts here presented to determine liability irrespective of the condition of the lights.

A decree will be entered adjudging the Rio solely liable for the damages occasioned by the collision of November 16, 1956. In lieu of specific findings of fact and conclusions of law, this memorandum will be adopted in accordance with General Admiralty Rule 46½, 28 U.S.C.A.

Present decree after notice.