Claim of **GYPSUM CARRIER (bareboat charterer)** and **Oceanic Carrier (owner)** of the **MOTORSHIP PACIFIC CARRIER** as Assignees of Seaboard Coast Line Railroad Company against **Union Camp Corporation** and the **United States.**

Civ. A. No. 2798.

United States District Court,
S. D. Georgia.

Feb. 12, 1979.

George H. Chamlee, Chamlee, Dubus, Sipple & Walter, Savannah, Ga., for Pacific Carrier, Gypsum Carrier, Inc., and Oceanic Carrier, Inc.

Kirk M. McAlpin, King & Spalding, Atlanta, Ga., Stanley R. Wright, Ulmer, Murchison, Ashby & Ball, Jacksonville, Fla., for Union Camp Corp.

David V. Hutchinson, Dept. of Justice, Admiralty and Shipping Section, Washington, D. C., for the U. S.

Arnold C. Young, Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., for Seaboard Coastline R. Co. as assignor of its rights to Pacific Carrier and its owner and charterer in settlement of its claim with the latter.

## OPINION

LAWRENCE, Senior District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.

*Background of Litigation*

In threatening weather, unfavorable tide and with a tornado watch in effect for the immediate area, the 580 foot *Pacific Carrier* headed out to sea on the night of April 23, 1971. Shortly after she was undocked a very heavy rainfall commenced. About one mile from where the vessel had undocked she collided with the Seaboard Coastline Railroad Company bridge spanning the Savannah River nearly opposite the Union Camp Corporation. The *Pacific Carrier* completely missed the channel opening in the bridge and knocked the structure into the river.

Seaboard filed an *in rem* action in this Court against the *Pacific Carrier* [*] and an in personam action against the owner and charterer.

The vessel petitioned for exoneration from and limitation of liability. Several claims were made by other vessels and companies for damages caused by the delay that ensued in clearing the wreckage so as to make the channel navigable.

Union Camp Corporation and the United States were subsequently impleaded by *Pacific Carrier* under Rule 14(c), F.R.Civ.P. The vessel's claim against such third-party defendants is that smoke from the stacks of the pulp mill suddenly obstructed vision from the bridge and that the Coast Guard negligently failed to require adequate lighting to mark the 200-foot opening in the lift.

Union Camp moved to dismiss on the ground that it was not subject to the admiralty jurisdiction. This Court on January 3, 1973, sustained that contention on the basis of *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454. On appeal the Fifth Circuit reversed. It ruled that industrial smoke obscuring navigable waters constitutes a navigational hazard within the admiralty jurisdiction. *In re Motorship Pacific Carrier*, 489 F.2d 152, cert. den. 417 U.S. 931, 94 S.Ct. 2643, 41 L.Ed.2d 235.

The liability issue was tried before the Court on February 3-7, April 1-4, May 27-29, and August 26-29, 1975. On June 11, 1976, this Court was informed that a settlement agreement had been reached between the owner and charterer of the *Pacific Carrier* and Seaboard Coastline. Under the terms thereof, the Railroad agreed to assign to *Pacific Carrier* its claims against Union

---

[*] Hereafter except when used in specific reference to the vessel herself *"Pacific Carrier"* shall include the owner and bareboat charterer.

Camp and the United States acting through the Coast Guard. The assignment included the claims against Seaboard by other parties.

The settlement was subsequently consummated. Union Camp thereupon moved to dismiss the third-party action brought by the owners of the vessel on the ground that the settlement automatically released all joint tortfeasors, including Union Camp. It principally relied on *Romero v. Frank's Casing Crew & Rental Tools, Inc.*, 229 F.Supp. 41 (W.D., La.), aff'd 342 F.2d 999 (5th Cir.) in which the district court dismissed a Jones Act claim because the injured seaman had settled a maritime tort action against a joint tortfeasor.[1]

On March 3, 1977, this Court ruled that the assignment of such claims was valid and constituted a covenant not to sue rather than a release and therefore did not have the effect of releasing other joint tortfeasors. I based my decision primarily on *Cates v. United States*, 451 F.2d 411 (5th Cir.) in which Chief Judge Brown adopted what he called the "modern, sensible rule that the consequence of the release is to be determined by the intentions of the parties." 451 F.2d at 415. The Fifth Circuit allowed the action against the government despite plaintiff's release of a joint tortfeasor. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 342–48, 91 S.Ct. 795, 28 L.Ed.2d 77.

In the same Order I ruled that the Anti-Assignment Statute, 31 U.S.C. § 203, which voids assignments against the United States, is not applicable to actions brought under the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq.* See *Seaboard Fruit Co., Inc. v. United States*, 73 F.Supp. 732 (S.D.N.Y.).

As stated above, *Pacific Carrier* has settled with all parties except Union Camp and United States Coast Guard. The bond for stipulation of value of the vessel was dissolved by Order of Court dated November 8, 1978. The limitation of liability feature of the case thus became moot.

A final evidentiary session was held on June 28–30, 1976, at which time rebuttal evidence was heard. Oral argument, briefing, preparation of proposed Findings and Conclusions extended to early 1977. Because of my heavy workload I have been unable to spare since then the three weeks which have been devoted to the preparation of this Opinion in a case where the record runs to over 7,250 pages. Its incubus-like presence has bedeviled this Court for two years.

## II.

### Issues

Two questions remain before this Court for determination. They are:

1. WHETHER AND TO WHAT EXTENT UNION CAMP; *PACIFIC CARRIER*, AND/OR THE UNITED STATES WERE AT FAULT.

2. WHETHER A PARTY SETTLING A CLAIM AND TAKING AN ASSIGNMENT OF ALL CLAIMS MAY RECOVER MORE THAN THE AMOUNT PAID IN SETTLEMENT.

## III.

### Findings of Fact

1. Oceanic Carrier, Inc. owns the *Pacific Carrier* which at the time of the collision was being operated by Gypsum Carrier, Inc. as bareboat charterer and owner *pro hac vice*. The vessel was chartered to Caribbean Steamship Company for the purpose of shipping gypsum from Halifax to Savannah.

2. The *Pacific Carrier* is of Liberian registry. Her overall length is 579.83 feet, and her beam is 72.18 feet. It is diesel-powered and propelled by a single right-hand screw. The bridge is located aft. The port anchor

---

1. That ruling was disapproved in *Billiot v. Sewart Sea Craft, Inc.*, 382 F.2d 662 (5th Cir.).

and chain had been lost in February, 1971. It was not replaced. However, the ship remained in class with the American Bureau of Shipping under the condition that the anchor be replaced as quickly as possible.

The vessel carried a full complement of twenty-seven men and nine officers. She was completing her third voyage between Halifax and Savannah since March 24, 1971.

3. The *Pacific Carrier* docked at National Gypsum Company approximately one mile upstream from the Seaboard bridge on April 21, 1971, and proceeded to discharge her cargo.

4. The bridge is a vertical lift drawbridge which provided a rail connection between the mainland and Hutchinson Island in the Savannah River. Its two hundred-foot opening is located in the center of the four hundred foot ship channel. The centerline bearing is 138 degrees true.

5. The bridge had been rammed by a vessel in 1966 and was badly damaged in the collision. A year later, the fender system was grazed by the *Partula* while piloted by Mr. Harry J. Padgett.

6. Following the 1966 collision, the bridge was repaired. Its design as originally built and as the structure was rebuilt after the collision, was formally approved by the Coast Guard. See *Seaboard Airline R. Co. v. Pan American Petroleum and Transport Company,* 199 F.2d 761 (5th Cir.).

7. The Coast Guard approved the same type lights for the rebuilt structure which were on the bridge prior to the 1966 collision. At the time of the 1971 collision, the lights in question fulfilled Coast Guard Regulations. There were four red pier protection lights, one on each fender; two red pier lights, one on each pier; and two green lift span lights. At the time of the collision, the Coast Guard had approved and Seaboard had installed temporary red flashing lights on the north side because of dredging operations in the Savannah River.

8. Union Camp Corporation operates a pulp, paper, and bag manufacturing plant on the south bank of the Savannah River. It is upriver from and nearly opposite the former Seaboard bridge. The plant is one of the largest integrated pulp and paper mills.

9. Smoke emitted during the manufacturing process sometimes obscures the Seaboard bridge. Following the 1966 collision, the United States Coast Guard was requested to improve the lighting on the bridge. River pilots had complained that smoke and fog was encountered at that point more frequently than elsewhere and that the condition impeded navigation. The Savannah Port Authority requested the Coast Guard to investigate the situation. The Union Camp plant was regarded by many persons working on the riverfront to be the major contributor to the smoke and haze problem in the vicinity of the bridge. A Coast Guard officer discussed the matter with plant officials. After conducting its own study, Union Camp denied that the emissions obstructed navigation. The Coast Guard took no further action other than refusing to approve the experimental use of fog penetrating lights on the bridge.

10. The discharge of the *Pacific Carrier* was completed at 9:30 P.M. on April 23rd. About that time, H. J. Padgett, the senior Savannah River pilot in point of service, came aboard. Padgett prepared to take the vessel out at once although there existed at the time a maximum ebb tide in the direction of the bridge. There was no urgency which necessitated immediate sailing. Weather conditions, as stated, were extremely unstable.

11. A strong cross current or sheer of approximately sixteen degrees southward begins approximately 1,000 feet from the bridge. Its maximum effect on navigation is experienced at ebb tide.

12. The *Pacific Carrier* was carrying no cargo. She was trimmed to the stern and

was drafting twelve feet forward and twenty-five feet aft.

13. As was stated earlier, a tornado watch had been issued for the surrounding area at 6:00 P.M. It remained in effect until midnight. A tornado warning was effective from 7:20 to 8:50 P.M. Rainfall at the Savannah weather station was recorded at 1.35 inches between 7:00 and 11:00 P.M. Except for a sixty-four knot gust at 8:23, wind velocities were moderate. Between 10:00 and 11:00 P.M., they ranged from four to ten knots with one eighteen knot gust at 10:21 P.M. At 9:59 P.M. visibility at the weather station was one and one-half miles with thunderstorms overhead.

14. At 9:30 P.M. the rain had become a light drizzle. From the place where the *Pacific Carrier* was docked Padgett could see the lights on the bridge. Visibility was unrestricted up to five miles. Wind was moderate from the northeast, blowing industrial smoke from Union Camp away from the river.

15. Around 9:45 P.M. the tug *Lawton M. Calhoun* came alongside. The docking master, Dennis Witherington, reported to the bridge about 9:50. The ship was undocked without problem at 10:20. The tug let go the vessel about 10:25 and proceeded upstream. The *Pacific Carrier* was then approximately 4,200 feet upriver of the bridge. When it headed for sea, Padgett took over the con. At that time, according to the latter, "It was a light drizzle. The wind was in the same direction it was when I reported aboard. Visibility was good. You could see all the lights. You could see the framework of the bridge. You could see below the bridge . . . . It was a strong ebb tide."

16. Padgett further testified in his deposition:
"We had already passed the dredge *Pullen*. We had just passed the American Oil dock, and I checked ahead to the center of the draw and I asked the Quartermaster, I said, "What's your heading?' and he told me, as near as I remember, he said '142,' and I immediately stepped back and looked at it myself to be sure there was no mistake, and that instant we had a sudden shift in the wind and a heavy rain and a dense smoke came down on us without a minute's warning whatsoever and it blotted out all visibility. It was the most dense smoke I had ever seen, and there was nothing to do but to proceed on because the size of the ship and I was too near the bridge to have done anything different or attempted to do anything different."

17. Jason Woods, who was tender on the Seaboard bridge, testified that he could see the *Pacific Carrier* when the tug towed her into the channel. "And, there was a period of time that I lost it. It completely blacked out . . . ." "[T]here was a thunder cloud in progress. Smoke settled in the river." "I was still in my tower, looking out the window to upstream—up west, and when his mast pole lights appeared through the smoke and rain, whatever, I had to make a getaway, and I knew he was off course, and I had to make a getaway." He ran for safety. According to Woods, the smoke was upriver of the bridge and was from the Union Camp plant.

18. Captain Padgett thus described the subsequent events:
"[A]t the last moments I observed this green light up in the sky, which I knew, or I thought, was the center of the lift span. There was no way I could tell how far ahead those lights were, and I realized by the way it lined up that the ship was too much to the right, so I immediately put the wheel hard over to the port and I said 'half ahead' and then I immediately said 'full ahead', and I don't think it was but just a few seconds after that before we struck the bridge."

19. When Padgett saw the green lift span light, he realized that the vessel was to the right of the draw and ordered "hard

aport-half ahead" to correct the error. He then ordered "full ahead . . . to try to bring the ship back more to port in the draw." Before the "full ahead" order was executed, the *Pacific Carrier* struck the bridge. It was then doing approximately eight knots.

20. The *Pacific Carrier* struck the main span between the first main pier supporting the draw on the south side and the next pier south. The impact collapsed the south tower, which supported the draw, as well as the draw into the river. After the collision, Padgett ordered the ship's engines stopped. The vessel floated through the breach in the bridge structure and emerged downstream of the bridge.

21. The vessel struck the bridge between 10:29 and 10:30, less than ten minutes after she undocked.

22. S. G. Gojkogoseobneeic, Master of the *Pacific Carrier*, testified that "there was a shift in the wind and became a heavy rain and the smoke from the mill which is in the southern part was there." When the vessel hit the smoke, he noticed that the pilot looked at the radar. The Captain of the vessel admitted that he never considered corrective action even after the emergency became apparent. His role was an entirely passive one.

23. The bosun, Enrique Fuente Torres, testified that he was stationed on the forecastle. He said that at the time of undocking there was a slight mist. Visibility, however, was very good. After directing some crewmen to close the Number One hatch, Torres realized that the ship was in a cloud of smoke. He took up his position by the single anchor at the bow. Within a few minutes, he saw a red light overhead and what appeared to be a pier of the bridge. Seconds thereafter the collision occurred.

24. Captain Nathaniel A. Magwood of the tug *Lawton M. Calhoun* testified that he let go the *Pacific Carrier* at 10:25 and proceeded back upstream. He received a call that the bridge was down and turned the tug around. "I noticed that conditions had worsened down there. I couldn't see the light on the bridge. The vessel was not visible. . . . it was quite evident then that the source of the obscurity was from the stacks of the Camp Company, there."

25. For all practical purposes the bridge was a total loss. After the collision, the Coast Guard declared the bridge an obstruction to navigation. It was not rebuilt. The debris was completely removed from the site.

26. In addition to the claim for damages to the bridge, *Pacific Carrier* settled all claims for freight and demurrage by ships delayed as a result of the blocking of the channel by the wreckage, and assignments to the shipowner and charterer were taken in each instance.

27. Harry J. Padgett, Jr., who was the senior Savannah River pilot in years of service with the Savannah Pilot's Association, was too ill to testify at trial. His deposition had been taken on October 11, 1971, less than six months after the accident. It was introduced at trial as Plaintiff's Exhibit 59. Padgett had become a Master of tugs and docking pilot in 1935 and received his pilot's license in 1945. Prior to the collision, he had piloted the *Pacific Carrier* twice. He thought the ship handled well. He had had no problems with the crew.

28. Padgett arrived at the National Gypsum dock about 9:20 P.M. and was aware that a tornado watch was in effect. On his arrival, "It was raining but not hard." When he boarded the *Pacific Carrier* at 9:30, visibility was good. There was a strong ebb tide. The Captain, the helmsman, and the docking master were inside the bridge when the ship undocked.

29. As previously stated, Padgett took over the control of the vessel as soon as the vessel was well clear of the dock and the docking pilot returned to his tug. The *Pa-*

*cific Carrier* proceeded at dead ahead slow, 4 or 5 knots, independently of the effect of the ebb tide. After the vessel had passed the dredge *Pullen* and the American Oil dock, Padgett visually lined up the ship's bow with the center of the draw. The gyro heading was 142 degrees.

30. According to Padgett, visibility was suddenly obscured by "a sudden shift in the wind and a heavy rain and a dense smoke came down on us without a minute's warning whatsoever and it blotted out all visibility." When the smoke enveloped the vessel, Padgett glanced at the radar. It was "snowed in." "I could not make anything out insofar [as] the opening in the draw was concerned." However, he "was not relying on the radar. I was relying on the visibility to see the lights on the bridge."

31. Padgett did not see fit to take corrective action. When the vessel was what he estimated to be four or five ship lengths from the bridge, he could see no lights. "[B]ecause of the width of the channel and the strong current, following current, we didn't have anchoring room, didn't have swinging room, and our only chance of not having an accident was to proceed on." Captain William T. Brown, Master Pilot, testified that dropping anchor and reversing the engines at that stage would have caused the vessel to hit the bridge broadside. If the ship had been beached on the north bank, she would have swung around and struck the bridge.

32. On "numerous occasions" Padgett had encountered smoke at that point in the river but "it would only [last] for a few seconds." The pilot of the *Pacific Carrier* was aware of the effect of sailing on an ebb tide. "When you have a following current it is like going down hill with a pair of snow shoes on or skis, I should say, you can't stop." Mr. Padgett seems to have ignored the effect of the cross current near the draw.[2] "I cannot explain why we did not make a safe passage through there," he testified in his deposition.

ON THE NEXT PAGE OF THIS OPINION APPEARS A DIAGRAM DEPICTING VARIOUS STRUCTURES ALONG THE RIVER; CONDITIONS IN THE STREAM; THE PROGRESS AND ROUTE OF THE *PACIFIC CARRIER* IN APPROACHING THE BRIDGE; THE POINT OF IMPACT, AND MATERIAL DISTANCES INVOLVED. IT WILL SERVE BETTER TO EXPLAIN AND ILLUSTRATE THE FOREGOING FINDINGS OF FACT.

[See following illustration.]

2. He had previously experienced the effect of the sheer. In 1967, while piloting the *Partula*, the vessel struck the southern fender of the bridge.

1058

LEGEND

A-PACIFIC CARRIER AT GYPSUM DOCK 5300FT.
B-TUG CALHOUN LETS GO P.C. AT 10:25 4200FT.
C-P.C. ENGULFED IN SMOKE 2500 FT.
D-P.C. AT CROSS SHEER CURRENT 1200 FT. SPEED 8 KNOTS WITH EBB TIDE
E-P.C. STRIKES PIER 10:29 — 10:30

SCALE: H-1"=500'
V-1"=300'

33. Several other pilots testified at trial. They were practically unanimous that under the circumstances existing on April 23rd they would have successfully piloted the *Pacific Carrier* through the bridge. They were also in agreement that once the heavy obscuration set in, no corrective action was feasible.[3] Like Padgett, they would have attempted to proceed through the draw. George E. Henry, a bar pilot for twenty-five years, agreed on cross-examination that pilots simply gamble that the smoke will abate in time for the ship to clear the draw.

34. Joseph P. Ryan, a former master pilot, testified that the special hazards connected with the Seaboard bridge were the smoke from the plant, the narrowness of the draw opening, and the strong current. According to the pilots, the smoke conditions on the river had grown progressively worse over the years. The fact of the cross current was common knowledge. Nearly all agreed that on a heading of 142 degrees with no rudder correction, the current would take the ship into the bridge.

35. The *Pacific Carrier* had a single radar antenna and transmitter. There were two radar scopes on the bridge, a larger master unit and a smaller "slave" unit. The master unit controlled the anti-rain clutter function which was not activated during the emergency. Proper radar utilization, particularly in close quarters, requires constant observation of the scope. According to the evidence, for maximum benefit, the scope should be observed prior to any emergency so that changes in the picture may be recognized and evaluated. Padgett glanced at the scope only once. He was relying on visual observation rather than on radar.

36. Captain Gojkogoseobneeic testified that no one member of the crew was assigned to observe the radar. Joseph Dumanic, third mate, turned on the radar when Padgett came aboard and set the range for three quarters of a mile. He escorted the docking master off the ship about 10:22. When he returned to the bridge visibility was zero. He tried unsuccessfully to locate the draw on the scope.

37. The ship lacked a proper lookout. The chief mate, Jospi Biuk, was stationed on the fo'c'sle near the bow of the ship. He had a loudspeaker for communicating with the bridge. When asked on deposition what his duties were, he responded that he was there "mainly for the purpose of dropping the anchor if necessary." There was no mention of his serving as a lookout.

38. When the bow became engulfed in smoke, he made no report to the bridge. At that time the *Pacific Carrier* was approximately 2,500 feet from the bridge. Biuk was unable to see anything ahead until he saw the bridge lights. At that time, he ordered the bosun and deck hands to abandon their positions. He did not report sighting the light prior to leaving his position at the bow.

39. As stated, the Coast Guard had received complaints from the Savannah Port Authority concerning the Union Camp's emissions of smoke. In November, 1967, the Coast Guard wrote to Union Camp that industrial smoke from its stacks occasionally obscured the bridge lights. After undertaking its own investigation, Union Camp informed the Coast Guard on January 15, 1968 "that such emissions do not constitute an obstruction to the subject aid to navigation."

40. Union Camp took no further action. At that time the company was engaged in an air quality program required by Georgia law. Ga.Code Ann. § 88–901. The program was designed to reduce particulate matter in the mill effluent. The Company had no program designed to study the smoke conditions at the bridge.

41. On the day of the collision, Union Camp's stacks and vents were emitting approximately 474,325 pounds of gas per min-

---

3. There was testimony that Padgett could have dropped anchor and reversed engines or that he could have beached the vessel on the north side of the river. The weight of the evidence, however, is that such actions would have been ineffective and would have resulted in greater damage to the ship.

ute. This includes 29,415 pounds of water vapor, 35 pounds of saltcake, 13 pounds of fly ash, and 5 pounds of lime. The plant did not reduce production as a result of atmospheric conditions. During State air alerts,[4] the Company inspected its emission control equipment, limited bark burning, and did not start up equipment which was down when the alert began. Tests conducted by the Georgia Department of Public Health a week before the collision indicated that the majority of the equipment failed to comply with air quality regulations. No systematic watch was made to determine effects of the plant's smoke effluent at the bridge or the surrounding river.

42. Union Camp contends that the obscuration of the bridge on April 23rd was caused by heavy rain and not by emissions from its stacks.

43. The pilot and docking master on the tug *Calhoun* testified that when the tug turned back to the bridge after the collision, the *Pacific Carrier* and the bridge were engulfed in smoke. The tug itself encountered smoke after it passed the American Oil dock approximately 2,600 feet from the bridge.

44. Union Camp's meteorological expert, Dr. J. R. Mahoney, testified that the mill plumes would have been carried above the level of the bridge and would not have obscured the bridge. He analyzed wind readings from the Savannah weather station and from two anemometers, one at Union Camp 3,300 feet from the bridge and one installed by the Georgia Air Quality Evaluation Service 2,500 feet from the bridge. According to his calculations, the wind velocities were not strong enough to counteract the natural bouyancy of the heated effluent. He determined that "all of the bridge structure across the whole channel, all of the tower bases and· the like—would have remained clear of this effluent."

45. Dr. W. L. Donn, plaintiff's meteorological expert, disagreed with Dr. Mahoney's conclusions. In addition to the material analyzed by the latter, Donn reviewed and analyzed barograms (atmospheric pressure readings) and the surface weather observation records of the Savannah weather service. He concluded that Dr. Mahoney had failed to consider the looping effect caused by vertical motion changes in the atmosphere.[5] The atmospheric changes and the existence of thunderstorms were favorable conditions for looping. Dr. Donn's theory was intended to account for how the members of the tug *Calhoun* and the bridge tender saw smoke obscuring the vessel and the bridge.

### Claims Against the Coast Guard

46. Essentially, the claim against the United States Coast Guard is that it was negligent in failing to require improved lighting and radar reflectors on the bridge. Early in 1967, the Savannah Ports Authority requested the Coast Guard to consider improved lighting for the Seaboard bridge. It replied that it could not require the owner to install lights other than those required by its Regulations. The Coast Guard was aware that one source of obscuration was smoke from Union Camp's stacks.

47. Although other complaints were received, the Coast Guard approved the installation of lights on the bridge as they existed prior to the 1966 collision. The lights in place and in operation at the time of the collision complied with the minimum standards required by the Coast Guard. A representative discussed pollution control with Union Camp officials and toured the plant. The Coast Guard took no action until sometime in 1970. At that time it was suggested to Seaboard by Ports Authority officials that large street lights be installed on the bridge. Seaboard agreed to do so if the Coast Guard approved same. However, the latter responded that it did not "offi-

---

4. Air alerts were issued when conditions were conducive to excessive pollution, generally during a temperature inversion.

5. Looping reflects the changes in a plume caused by variable atmospheric conditions. The variations create a serpentine effect in the plume which rises and falls vertically with such changes. The plume can reach ground level.

cially approve lights of this type which are not prescribed in the U. S. Coast Guard Aids to Navigation Regulation CG–208."

## ULTIMATE FINDINGS OF FACT

A. *Pacific Carrier* and Union Camp were jointly negligent and the fault of each concurred in and contributed to the collision with the bridge.

■ B. While Padgett was a member of the Savannah Pilot's Association, an independent contractor, the shipowner and charterer are responsible to third parties for negligence in the pilotage of the *Pacific Carrier*. See *Cabins Tanker Industries, Inc. v. M/V The Rio Maracana,* 182 F.Supp. 811 (E.D., Va.), aff'd 285 F.2d 592 (4th Cir.), cert. den. 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241; *Standard Dredging Corporation v. S/S Syra,* 290 F.Supp. 260 (D.Md.).

C. While there was testimony by Union Camp witnesses that the very heavy rain caused loss of visibility, the preponderance of the evidence is that the mixture of rain and smoke produced the obscuration that concealed the opening in the bridge.

D. The comparative fault rule is applicable. See *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

■ E. The respective percentages of vessel and industry negligence for the collision and damage to the bridge are as follows: *Pacific Carrier* eighty percent (80%); Union Camp twenty percent (20%).

(1) In arriving at these percentages of fault, this Court has considered the faulty judgment of the *Pacific Carrier* and its river pilot; the fact of colliding with a stationary object; persistence in following a 142 degree course toward the opening in spite of the known cross current sheering a vessel to starboard in approaching same; lack of proper look-out and equipment and inability or failure to take reasonable measures to stop the progress of the vessel when smoke first enshrouded it.

(2) As to Union Camp, this Court has considered the smoke emissions from the plant which it knew produces navigational difficulties in the vicinity of the bridge and the industry's failure to respond in any way to complaints in that regard from Savannah Ports Authority and others. In establishing Union Camp's percentage of fault, this Court has also considered the rareness of the configuration of smoke at surface level existing at the time and place of the collision as a result of very unusual atmospheric conditions.

■ F. The Coast Guard approved the bridge structure and the lighting. 14 U.S.C. § 81. The lighting on the bridge complied with existing Coast Guard regulations. 33 C.F.R. § 68.15–20. The Coast Guard was under no affirmative duty to direct increased lighting or to install radar reflectors. See 33 C.F.R. §§ 62.25–50(b), 68.20–10; and generally *Indian Towing Company v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48.

### IV.

*Conclusions of Law*

1. Admiralty jurisdiction exists in the instant case. 28 U.S.C. § 1333; 46 U.S.C. § 740; *In re Motor Ship Pacific Carrier, supra,* 489 F.2d 152.

2. *Pacific Carrier* and Union Camp are jointly liable for the damage caused by the collision with the Seaboard bridge and the respective negligence of each concurred in contributing thereto.

3. The comparative fault rule in *United States v. Reliable Transfer Co., Inc., supra,* is, as stated, applicable in this case.

4. The Coast Guard was not negligent in failing to order additional lighting on the bridge or in failing to install radar reflectors.[6]

■ 5. A vessel that strikes a stationary object is presumptively at fault. Under such circumstances, the ship is prima facie

---

**6.** The Coast Guard "may establish . . . aids to maritime navigation . . . ." 14

U.S.C. § 81. The duty is discretionary. *Kline v. United States,* 113 F.Supp. 298 (S.D.,Tex.).

negligent. *The Victor,* 153 F.2d 200 (5th Cir.); *Georgia Ports Authority v. Bilderdyk,* 402 F.Supp. 706 (S.D.Ga.). The presumption is rebutted only by a showing that the object was at fault or that the collision was inevitable. *The Clarita and The Clara,* 90 U.S. 1, 23 L.Ed. 146; *Bunge Corporation v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir.), cert. den. 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518.

6. "An accident is 'inevitable' or 'unavoidable' not only by an act of God 'but also when all precautions reasonable to be required have been taken, and the accident has occurred notwithstanding.'" *Atkins v. Lorentzen,* 328 F.2d 66, 69 (5th Cir.).

7. A pilot is under a duty "to avoid or minimize the chance of harm to" his vessel or other objects. *Boudoin v. J. Ray McDermott & Co.,* 281 F.2d 81, 85 (5th Cir.). "Where the current is such as to require a vessel to exceed the proper speed in a fog to maintain steerageway, that vessel should not be underway in the first place." *Avondale Marine Ways, Inc. v. The Crescent Cities,* 184 F.Supp. 773, 776 (E.D.La.), aff'd sub nom, *National Marine Service, Inc. v. Avondale Marine Ways, Inc.,* 287 F.2d 889 (5th Cir.).

■ 8. The *in extremis* doctrine does not apply "where a vessel is placed in a position of danger through her own fault." *United States v. S. S. Soya Atlantic,* 213 F.Supp. 7, 19 (D.Md.), aff'd 330 F.2d 732 (4th Cir.). The fact that no corrective action would have avoided the collision after the emergency arose is irrelevant.

■ 9. A pilot must be aware of local conditions, including cross currents. *Davidson Steamship Company v. United States,* 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 764; *Petition of M/V Elaine Jones,* 480 F.2d 11 (5th Cir.), cert. den. 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60. Padgett was negligent in maintaining a course heading of 142 degrees after the obscuration. The decision ignored the existence of the cross current existing near the draw which was known to him. Failure to correct the bearing in order to compensate for the cross current was one of the proximate causes of the collision.

10. The *Pacific Carrier* was at fault in not having its radar properly manned. See *Afran Transport Co. v. The Bergechief,* 274 F.2d 469 (2nd Cir.); *Villain & Fassio E. Compagnia Internazionale Di Genova Societe Riunite Di Naviazione, S.P.A. v. Tank Steamer E. S. Sinclair,* 207 F.Supp. 700 (S.D., N.Y.), aff'd 313 F.2d 722 (2nd Cir.), cert. den. 373 U.S. 948, 83 S.Ct. 1678, 10 L.Ed.2d 704.

11. The *Pacific Carrier* was at fault in not having a proper lookout. See *The Ariadne,* 80 U.S. 475, 478–79, 20 L.Ed. 542; *United States v. Tug Colette Malloy,* 507 F.2d 1019 (5th Cir.).

■ 12. A manufacturer which negligently allows industrial emissions to obstruct a navigable waterway is liable for damages caused thereby. *In re Motorship Pacific Carrier, supra,* 489 F.2d 152; *Bangor & Aroostook Railroad Company v. Ship Fernview,* 455 F.Supp. 1043 (D.Me.). Union Camp was aware that smoke from its stacks and vents frequently obscured the bridge. It was at fault in failing to take any action to minimize the condition created by its mill effluent.

13. Counsel for the owner and charterer of the *Pacific Carrier* urge that the rule established in 1873 in the case of *The Pennsylvania,* 86 U.S. 125, 22 L.Ed. 148, is applicable in view of the Regulation pertaining to navigable waters which forbids any person to "obstruct or interfere with any lights or signals maintained in accordance with the regulations prescribed in this part." 33 C.F.R. § 118.10 (33 C.F.R. § 68.01–10 at the time of the collision). In *The Pennsylvania* it was held that where a vessel commits a positive breach of a statute, she must show not only that her fault probably did not contribute to the collision but could *not* have done so.

Substituting in that "Rule" pulp mill for vessel, counsel contend that although the *Pacific Carrier* may also have been at fault in the allision, nevertheless because of the statutory violation of Union Camp in obscuring the bridge and bridge lights by its

smoke discharge, it bears the burden of proving that its act *could not* have contributed to the collision. Application of the *Pennsylvania Rule* would, at least before *Reliable Transfer,* automatically make Union Camp liable for one-half of the total damage resulting from the allision. The circumstances of the present case sufficiently distinguish it, in my opinion, from those in *The Pennsylvania.*[7] In the instant case the same burden of proof would belong to the *Pacific Carrier* which violated the statutory requirement as to lookout so that those two parties are in equipoise in the application of the "Pennsylvania Rule". However, apart from factual differences, the adoption in 1975 by the Supreme Court of the comparative or proportionate fault doctrine prevents any harsh result flowing from a strict application of the divided damage rule. *United States v. Reliable Transfer Co., Inc., supra.* The holding in that case renders unnecessary any consideration of *The Pennsylvania* in the present litigation.[8] "While the rule of *The Pennsylvania* still casts fault upon a party who has violated a statute and cannot overcome the heavy presumption, in view of *Reliable Transfer,* that fault must now be measured in its proportionate degree." *Southern Pacific Transportation Company v. Tug Capt. Vick,* 443 F.Supp. 722, 732 (E.D., La.).

■ 14. Obstruction of a navigable waterway is a public nuisance. *Corby v. Ramsdell,* 48 F.2d 701 (2nd Cir.). "A nuisance may be caused by negligence and may exist irrespective of negligence." *American Cyanamid Company v. Sparto,* 267 F.2d 425 (5th Cir.). That the nuisance may be industrial effluent rather than a physical obstruction is not critical. *In re Motor Ship*

*Pacific Carrier, supra; Eastern Air Lines, Inc. v. American Cyanamid Company,* 321 F.2d 683 (5th Cir.); *Holman v. Athens Empire Laundry Company,* 149 Ga. 345, 100 S.E. 207. "If a public nuisance shall cause special damage to an individual, in which the public do not participate, such special damage shall give a right of action." Ga. Code Ann. § 72–103.

■ Under the facts of this case it could be found that a public nuisance was created by the emission of smoke. Industrial necessity does not exonerate it. I do not rest this decision, however, on the theory of nuisance. Negligence can be and it is here a constituent or a factor of nuisance. Since this Court has determined that negligence by Union Camp contributed to the collision, there is no need to go further.

The damages sought by Seaboard amounted to $5,000,000. The amount paid by the shipowner and charterer in settlement thereof was $2,750,000. There is nothing of record to show the amounts paid to claimants in settling the several claims for delay and demurrage. Separate covenants not to sue were taken from such parties. Settlements are supposed to end litigation and not create a take-off point for litigating fresh issues.[9]

15. Under the facts and the law, the *Pacific Carrier* was 80% at fault and Union Camp 20%.

## V.

*Recovery Under the Assignment of Claims of an Amount Exceeding the Actual Settlement*

In this Court's Opinion-Order of March 3, 1977, it considered the question of whether,

---

**7.** For the frequent distinctions drawn by courts reluctant to follow *The Pennsylvania,* see Zapf, "The Growth of *The Pennsylvania* Rule: A Study of Causation in Maritime Law," 7 *Journal of Maritime Law and Commerce* (April, 1976), pp. 521–539. Some of the bolder courts, it is said, have simply ignored the rule. See 421 U.S. at 405, 95 S.Ct. 1708.

**8.** I add that even if the divided damage doctrine were still effective, I would probably decline, in the present factual setting, to follow the rule

creating so awesome a burden of rebuttal. The archaic doctrine of equal sharing of damages in collision cases, which became extinct in *Reliable Transfer,* belongs to the same order of coelacanth.

**9.** Under the covenants not to sue, Seaboard agreed "to refrain from making any claim or demand, or to commence, or permit to be prosecuted any action in law or equity or admiralty against" the plaintiffs.

under admiralty law, an assignee can recover more than it paid in settlement of the original claim. I stated: "In the uncertain state of the admiralty law in this area I hesitate to plunge into the murk . . . [T]he path may become more discernible."

However, there have been no clarifying developments in this area of law since my decision. The Fifth Circuit has never had occasion to pass on the question. In *The Gulf Stream,* 64 F. 809 (2nd Cir.), agents of one colliding vessel purchased cargo claims from shippers with goods on the other vessel for less than actual value. The district court held that the amount recoverable was limited to that actually paid on the basis that "it would be contrary to equity to allow such a purchaser to make a profit out of the transaction." 64 F. at 810. The Court of Appeals affirmed saying that "Like ordinary sureties, one cannot speculate upon the debt, to make a profit from the other; but, if one compromises, the other is entitled to the benefit, and is responsible only for his proportion of the amount actually paid, with interest." 64 F. at 811.

In *The William C. Atwater,* 110 F.2d 644 (2nd Cir.), the *Atwater* collided with a series of barges in tow. The owner of the tug settled the barge claims and took an assignment. The Court of Appeals held that "Contribution is an equitable right and if allowable between joint tort feasors, as it is in admiralty, no more ought to be exacted than one-half of the amount actually paid in satisfaction of the original claims." 110 F.2d at 646. Without citation of authority, one district court reached a contrary result. See *Moran Towing and Transportation Co., Inc. v. Conners Standard Marine Corp.,* 1963 A.M.C. 2641 (S.D., N.Y.), aff'd on other grounds, 316 F.2d 811 (2nd Cir.).

■ No other case has been cited by counsel or found by this Court. The rationale of the Second Circuit decisions appears to be a sound one. On the basis of *The Gulf Stream* and *The William C. Atwater,* I conclude that in admiralty the assignee of a cause of action which has been settled is entitled to recover from a joint tortfeasor only that amount actually paid by it in settlement.

## VI.

### Prejudgment Interest

■ Award of interest under general maritime law is in the discretion of the trial court. *Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968 (5th Cir.); *Weeks v. Alonzo Cothron, Inc.,* 493 F.2d 538 (5th Cir.); *Dennis v. Central Gulf S.S. Corp.,* 453 F.2d 137 (5th Cir.), cert. den. 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218. "In admiralty, [prejudgment] interest should be granted unless there are exceptional or peculiar circumstances . . . Defendants' lack of fault is not compelling. The plaintiffs were not responsible for delay. They cannot be charged with either the complexity of the case or the condition of the court's docket." *Socony Mobil Oil Company, Inc. v. Texas Coastal and International, Inc.,* 559 F.2d 1008, 1014 (5th Cir.).

■ Prejudgment interest is awarded to *Pacific Carrier* at the rate of 5% per annum on Union Camp's portion of liability found. Interest shall run from the date of the settlements by the shipowner and charterer with Seaboard and the various parties claiming damages by delay.

## ORDER

Judgment will be entered by the Clerk in accordance with the foregoing Findings of Fact and Conclusions of Law with interest as directed by this Court in Part VI hereof.

Costs of court as between Union Camp and the owner and charterer of the *Pacific Carrier* will be fixed in proportion to the percentages of fault found by this Court. No costs of court will be awarded the United States or Seaboard Coastline Railroad Company.

Interest is due at 5% by Union Camp on 20% of the cost of repairs to the *Pacific Carrier* following the collision. If the parties are unable to agree on the proper amount thereof within two (2) weeks from the date of this Order, an evidentiary hearing on affidavits will be directed.

This Order does not constitute a final judgment for the purpose of 28 U.S.C. § 1291.

