719 N.E.2d 1117 (1999)
308 Ill. App.3d 314
241 Ill.Dec. 714
In re CHICAGO FLOOD LITIGATION (Commercial Union et al., Plaintiffs-Appellants,
v.
City of Chicago, Defendant-Appellee).
Nos. 1-98-0593, 1-98-2326, 1-98-2364, 1-98-2589 and 1-98-2664.
Appellate Court of Illinois, First District, First Division.
September 30, 1999.
Rehearing Denied November 18, 1999.
*1120 Hugh C. Griffin, Daniel J. Zollner, Frederic W. Webber and Leslie J. Rosen of Lord, Bissell & Brook; Douglas M. Reimer, Stewart W. Karge and William P. Schuman of McDermott, Will & Emery; William J. Harte of William J. Harte, Ltd.; and Daniel K. Schlorf and Alan M. Goldberg of Barnow and Goldberg, P.C., Chicago, for Appellants.
Brian L. Crowe, Lawrence Rosenthal, Benna Ruth Solomon and Sonja D. Rajkovich of Corporation Counsel of the City of Chicago; and Theodore R. Tetzlaff, Thomas R. Mulroy, Jr., Richard P. Steinken and William J. Ryan of Jenner & Block, Chicago, for Appellees.
Justice RAKOWSKI delivered the opinion of the court:
This appeal involves the liability of defendant, the City of Chicago (City), for damages sustained by various business and building owners as well as individuals as the result of what has been called "the Great Chicago Flood." The plaintiffs-appellants are Commercial Union Assurance Company and other insurers of Great Lakes Dredge & Dock Co. (collectively Commercial Union), which assert claims as assignees, certain plaintiffs who suffered property damage (class plaintiffs), and Mary Sims, who suffered personal injuries.
Pursuant to a series of motions, the trial court determined that plaintiffs failed to allege causes of action that would invoke application of admiralty law. The trial court held that admiralty law could not apply because the City's alleged negligence as well as the resulting damages occurred on land, not on navigable water, and because the City's alleged tortious activity was not sufficiently related to traditional maritime activity. The trial court also held that, even if Commercial Union had alleged a cause of action sounding in admiralty law, it would not be able to maintain its action against the City as an assignee of some of the original plaintiffs' claims. The trial court reasoned that, because Commercial Union was an insurer of Great Lakes, the City's co-tortfeasor, an action by Commercial Union against the City would be the equivalent to a contribution action. The trial court concluded that this would offend the policy in admiralty law of holding each tortfeasor to a proportionate share of liability.[1] Thus, the effect of the trial court's decision was that, if plaintiffs were to sue the City, they would have to do so under Illinois law.
We disagree with the trial court's conclusions of law. First, we believe the fact that the City's alleged negligent acts and resulting damage occurred on land does not prevent application of admiralty law where a vessel caused the damage on land and the City's alleged negligence took effect on navigable water. We also believe the activity the City was engaged in at the time of the incident was substantially connected to traditional maritime activity. As such, we conclude that the alleged causes of action are governed by admiralty law. Accordingly, any state law that would interfere with the uniform application of admiralty law is preempted. Further, we find that Commercial Union may sue the City as an assignee of the original plaintiffs' claims. We conclude that, by allowing Commercial Union to sue the City and recover damages in accordance with longstanding admiralty principles, Commercial Union and the City will only be responsible for their own proportionate share of liability. Therefore, we reverse and remand.

*1121 I. PLAINTIFFS' ADMIRALTY TORT ALLEGATIONS
The following summary of facts and allegations was gleaned from Commercial Union's and class plaintiffs' complaints. Additionally, class plaintiffs' brief, to which Sims subscribes, joins and adopts all issues regarding admiralty jurisdiction that are discussed in Commercial Union's brief. Further, collective reference to Commercial Union, class plaintiffs, and Sims will be as "plaintiffs."
At the beginning of the twentieth century, Chicago constructed a subterranean freight tunnel system throughout the downtown area of the City. This tunnel system was mainly used for delivering coal to the sub-basements of various buildings. Although this system was decommissioned in the 1950s, in more recent years, the City has allowed various utilities to use the system. Specifically, the City has leased access to entities such as cable television, fiber-optic, and telecommunication companies. This allows the companies to provide various buildings with their services through the convenient access provided by the tunnel system. Such leases provide the City with an estimated $1 million in annual revenue.
About May of 1991, the City contracted with Great Lakes Dredge & Dock Company (Great Lakes) to replace timber pilings clustered around the piers of several bridges spanning the Chicago River, a navigable waterway. These pilings, or "dolphins," are designed to prevent ships from running into the piers. Because the dolphins are City property, it is the City's responsibility to maintain, repair, and replace them.
The contract between the City and Great Lakes required Great Lakes to furnish the necessary equipment for the job, including barges and tugs. The contract specifications included drawings by the City's engineers showing the new dolphin locations at each bridge site. The contract warned Great Lakes that if even slight changes were made in the positioning of the pilings, underground structures could be damaged. Plaintiffs allege the contract for the replacement of the dolphins along the Chicago River was maritime in nature and one of its principal aims was the continued safe and uninterrupted navigational passage of vessels on the river.
A portion of the underground tunnel system ran below the Chicago River under the Kinzie Street bridge. Plaintiffs allege that the City knew of its existence, as it maintained maps showing the location of the tunnel as well as the other tunnels. The City also knew that the same tunnel was connected to the basements and sub-basements of a number of downtown office buildings.
The complaint further alleged that the City failed to follow prescribed methods and procedures requiring the City to disclose the location of the tunnel to Great Lakes. Specifically, plaintiffs charge that the City failed to comply with, inter alia, the Illinois Underground Utility Facilities Damage Prevention Act (220 ILCS 50/10 (West 1998)), the City's own printed form entitled "Check List for Field Engineer's Review of New Projects," various sections of the Municipal Code of Chicago, prescribed procedures provided by the City's Board of Underground, as well as the City's "Administrative Procedure for Resident Architects/Engineers." Adherence to these procedural safeguards allegedly would have led to the discovery of the tunnel under the Kinzie Street bridge and the necessary disclosure of that information to Great Lakes. Plaintiffs further allege the City admitted that it did not investigate the presence and location of the tunnel and the effect of its presence on the project prior to or during Great Lakes' execution of the contract; nor did the City apprise Great Lakes of the Kinzie Street tunnel's existence either in the plans, specifications, drawings, or otherwise.
Great Lakes used two barges and a tug to perform the work. One barge carried pilings while the other carried a crane that *1122 pulled out the old pilings and drove the new pilings into the river bottom. During the course of the project, Great Lakes requested permission to change the location of the new pile clusters on the south side of the Kinzie Street bridge. Evidently, Great Lakes made the request to ensure that the bridge house would not be damaged during installation of the pilings and to ensure that the pilings would not be located inside the Chicago River's channel.
Although the City approved the modification to the plans and specifications for the location of that particular dolphin, plaintiffs allege that the City failed to follow the contract's provisions requiring any deviations from the specifications to be approved in writing. Instead, both the City's project manager and resident engineer orally approved the requested variance. The City also failed to prepare revised drawings pursuant to the Administrative Procedures for Resident Architects/Engineers and failed to have them reviewed by the resident engineer and approved by the project manager. It is alleged that, had these procedures been followed, a survey would have been performed of the underground structures near the new dolphin location thereby revealing the tunnel. Moreover, plaintiffs allege that the City admittedly failed to follow prescribed methods for inspecting and monitoring the work on the dolphin project, which were in place "to insure contract compliance."
Following the completion of Great Lakes' work and the City's discovery of the tunnel's breach, the City allegedly failed to follow prescribed methods of repairing the tunnel. Plaintiffs contend that, even after 12 inches of water had been discovered in the tunnel and investigation of the damage revealed a disaster waiting to happen, the City failed to follow statutory as well as City procedures for addressing emergency situations. These provisions would have authorized the City and its officials to circumvent typical public bidding processes in order to secure immediate repair work on the tunnel. However, the City failed to follow these emergency procedures and failed to repair the breach immediately, even though the City had a predesigned, standard bulkhead which it used for such circumstances. On April 13, approximately two months after the City was placed on notice of the tunnel's condition and need for repair, the tunnel wall collapsed, causing river water to rush into many sub-basements in downtown Chicago without any warning from the City.

II. PROCEDURAL HISTORY
On January 13, 1998, the circuit court denied with prejudice Commercial Union's motion for leave to file an amended complaint seeking to hold the City liable in admiralty for its alleged role in causing the flood. On June 16, 1998, the court dismissed Commercial Union's original complaint with prejudice, thus eliminating all of Commercial Union's claims against the City. On June 17, 1998, the circuit court dismissed with prejudice all of the admiralty claims asserted by class plaintiffs in their second amended consolidated class action complaint as well as Sims' admiralty claims contained in a separate complaint. We have jurisdiction pursuant to Supreme Court Rule 304(a).[2] 155 Ill.2d R. 304(a).

*1123 III. STANDARD OF REVIEW
When considering a motion to dismiss pursuant to section 2-615 of the Illinois Code of Civil Procedure (735 ILCS 5/2-615 (West 1998)) or a denial of a motion for leave to file an amended complaint, the court must interpret all well-pled allegations and supporting documents in the light most favorable to the nonmoving party. In re Chicago Flood Litigation, 176 Ill.2d 179, 189, 223 Ill.Dec. 532, 680 N.E.2d 265 (1997). Only where the plaintiffs fail to allege facts supporting a cause of action should the court grant the motion to dismiss. In re Chicago Flood Litigation, 176 Ill.2d at 189, 223 Ill.Dec. 532, 680 N.E.2d 265. Our review of the trial court's determination of a motion to dismiss is de novo. In re Chicago Flood Litigation, 176 Ill.2d at 189, 223 Ill.Dec. 532, 680 N.E.2d 265. Likewise, we review de novo the trial court's determination of whether substantive admiralty law applies to the instant case. Alderman v. Pacific Northern Victor, Inc., 95 F.3d 1061, 1063 (1996).

IV. RELATED PRECEDENT FROM THE UNITED STATES SUPREME COURT
Certain claims arising from the Great Chicago Flood in 1992 have been reviewed by the Illinois Supreme Court in In re Chicago Flood Litigation, 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, and the United States Supreme Court in Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). Grubart involved determination of whether claims against the City's co-tortfeasor, Great Lakes, were cognizable in admiralty. As such, the holding there provides substantial guidance here.
As discussed above, the City contracted with Great Lakes to perform the pile driving work on the Chicago River. After the flood, the victims brought actions in Illinois courts against both the City and Great Lakes. In turn, Great Lakes filed suit in United States District Court in an effort to limit its liability under the Limitation of Vessel Owner's Liability Act (Limitation Act) (46 U.S.C. App. § 181 et seq. (1994)). Under this statute, Great Lakes' liability would be limited to the value of its vessels involved in the incident if the tort Great Lakes committed sounded in admiralty and occurred "`without the privity or knowledge'" of the vessels' owners. Grubart, 513 U.S. at 531, 115 S.Ct. at 1047, 130 L.Ed.2d at 1033, quoting 46 U.S.C. App. § 183(a) (1994).
The City as well as Jerome B. Grubart, one of the victims, filed a motion to dismiss, contending that Great Lakes could not secure protection under the Limitation Act because the District Court lacked admiralty jurisdiction over the alleged torts. The District Court granted the motion, and the Seventh Circuit Court of Appeals reversed. Great Lakes Dredge & Dock Co. v. City of Chicago, 3 F.3d 225 (7th Cir. 1993), aff'd, 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). Grubart and the City sought review in the United States Supreme Court.
The Supreme Court affirmed the seventh circuit's decision, concluding that a federal admiralty court has jurisdiction over claims that Great Lakes' faulty replacement work caused the flood damage. See generally Grubart, 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024. While the Court found that a vessel caused the victims' damages on land, it also found that, if Great Lakes committed a tort, it must have done so over navigable waters. The Court further concluded that the activity of replacing the pilings and dolphins in the Chicago River giving rise to the incident bears a substantial connection to maritime activity. Although the Court's holding is tailored toward Great Lakes' alleged negligence, it provides substantial guidance in the instant case since the alleged negligent acts and omissions of Great Lakes are tightly intertwined with those of the City.

V. APPLICATION OF ADMIRALTY LAW
In the instant case, plaintiffs contend the trial court erroneously determined *1124 that their claims do not arise under federal admiralty jurisdiction. We agree, although we believe the issue is more accurately framed in terms of choice of law rather than of jurisdiction. Undoubtedly, the circuit court has jurisdiction over the claims raised in the suits against the City. This is because, inter alia, the City resides and conducts business in Illinois (735 ILCS 5/2-209 (West 1998)), not because the circuit court is a court of admiralty. However, under the "saving to suitors" clause, it may adopt admiralty remedies in exercising in personam jurisdiction. American Dredging Co. v. Miller, 510 U.S. 443, 446-47, 114 S.Ct. 981, 984-85, 127 L.Ed.2d 285, 293 (1994). The question therefore is whether Illinois law or admiralty law controls plaintiffs' claims. Notwithstanding this distinction, for our purposes, determination of whether admiralty law applies is governed by the same analysis for determining whether admiralty jurisdiction exists. See Harville v. Johns-Manville Products, Corp., 731 F.2d 775, 779-80 (11th Cir.1984).
Traditionally, the test for determining whether admiralty tort jurisdiction applied to a certain case was simple: the question asked was whether the tort occurred on navigable water. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 531, 115 S.Ct. 1043, 1047, 130 L.Ed.2d 1024, 1033 (1995); Alderman v. Pacific Northern Victor, Inc., 95 F.3d 1061, 1063 (11th Cir.1996). Where the answer was yes, admiralty tort jurisdiction applied.
In 1948, Congress enacted the Admiralty Jurisdiction Act (Extension) (Extension Act) (46 U.S.C. App. § 740 (1994)), in an effort to expand admiralty jurisdiction to claims involving land-based damages. It provides in part:
"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. App. § 740 (1994).
"The purpose of the Act was to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over `all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." Grubart, 513 U.S. at 532, 115 S.Ct. at 1047-48, 130 L.Ed.2d at 1034.
Through a trilogy of cases, the Supreme Court qualified Congress' expansion of admiralty jurisdiction, circumventing application of admiralty law in cases involving activities having little or no connection with traditional maritime activities. See Sisson v. Ruby, 497 U.S. 358, 363-67, 110 S.Ct. 2892, 2896-98, 111 L.Ed.2d 292, 299-303 (1990); Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 209-10, 83 S.Ct. 1185, 1187-88, 10 L.Ed.2d 297, 300-01 (1963); Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 260, 93 S.Ct. 493, 500-01, 34 L.Ed.2d 454, 463 (1972). As a consequence of these cases, admiralty jurisdiction will be invoked only where the incident at issue satisfies conditions both of location and connection with a maritime activity. Grubart, 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035. We address each requirement in turn.

A. Locality Test
The City contends the locality test cannot be met. The City believes the lack of any allegations that the City engaged in tortious conduct while it or its agents were on a vessel on navigable water is dispositive. It points out that the complaints fail to allege the City operated a vessel that engaged in any wrongful conduct on navigable water causing injury on land. The trial court found this argument persuasive. The court reasoned that, because the City's alleged negligent acts and omissions leading up to and following the breach of the tunnel all occurred on land, these pre-breach and post-breach activities could be *1125 considered neither torts that occurred on navigable water nor conduct that occurred on a vessel on navigable water. Although the trial court carefully followed Grubart, we disagree with the focus of its analysis and conclusions of law.
"A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." (Emphasis added.) Grubart, 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035. The former part of the test represents the traditional approach while the latter represents the effect of the Extension Act. Because the Supreme Court has joined the two parts with a disjunctive conjunction, it follows that, if the allegations satisfy either, the location test is met.
Plaintiffs' allegations clearly satisfy the location test through the Extension Act analysis. Although the trial court found dispositive that the City's alleged negligent acts or omissions did not occur on a vessel on navigable water, this fact has no impact under the Extension Act location analysis. Rather, the inquiry is simply "whether [the] injury suffered on land was caused by a vessel on navigable water." Grubart, 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035; In re Oil Spill By the Amoco Cadiz, 699 F.2d 909, 912 (7th Cir. 1983) (admiralty jurisdiction applied to cause of action against ship builder whose land-based acts and omissions allegedly caused oil tanker to break apart off of coast of France); c.f. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 209-10, 83 S.Ct. 1185, 1188, 10 L.Ed.2d 297, 301 (1963) (rejecting strict interpretation that Extension Act requires injuries to be caused by the physical agency of the vessel or a particular part of it and accepting interpretation that Extension Act contemplates the negligent acts of ship personnel); 1 T. Schoenbaum, Admiralty and Maritime Law § 3-4, at 74 (2d ed. 1994) ("Damages to shore structures and injuries on land may be within the scope of the Admiralty Extension Act * * *, if in fact the damage is proximately caused by the vessel or its master or crew").
In Grubart, the Supreme Court found the weakening of the tunnel wall and subsequent flooding of the buildings' sub-basements must have been done "by a vessel." The Court reasoned:
"Even though the barge was fastened to the river bottom and was in use as a work platform at the times in question, at other times it was used for transportation. [Citation.] Petitioners do not here seriously dispute the conclusion of each court below that the Great Lakes barge is, for admiralty tort purposes, a `vessel.' The fact that the pile driving was done with a crane makes no difference under the location test, given the maritime law that ordinarily treats an `appurtenance' attached to a vessel in navigable waters as part of the vessel itself. [Citations.]" Grubart, 513 U.S. at 535, 115 S.Ct. at 1049, 130 L.Ed.2d at 1035-36.
In the instant case, the vessel and alleged damages are the same as those alleged in Grubart. Accordingly, the Supreme Court's analysis of whether a vessel caused the land-based flood damage answers the question in this case; thus, we adopt the Court's findings and conclude that the location test is satisfied.
Although the location test is satisfied through the Extension Act analysis, we note that the allegations also meet the traditional approach of the location test. Determination of whether the tort occurred on navigable water depends on the "locality of the wrong." Executive Jet Aviation, Inc., 409 U.S. at 253, 93 S.Ct. at 497, 34 L.Ed.2d at 458. The phrase "the locality of the wrong" has been subject to three possible interpretations: "(1) the place where the damage occurs; (2) the place where the wrongful act is committed; or (3) the place where the wrongful force comes in contact with the person or property *1126 injured." 1 T. Schoenbaum, Admiralty and Maritime Law § 3-4, at 72 (2d ed.1994). In this case, the trial court subscribed to the second interpretation that the locality of the wrong is the place where the wrongful act was committed. This interpretation, however, has been discarded and replaced by the well-settled proposition that admiralty jurisdiction may be invoked even though the alleged tortious acts or omissions occurred on land. See Executive Jet Aviation, Inc., 409 U.S. at 254, 266, 93 S.Ct. at 497, 503, 34 L.Ed.2d at 459, 466; Mink v. Genmar Industries, Inc., 29 F.3d 1543, 1545 (11th Cir.1994); Great Lakes Dredge & Dock Co. v. City of Chicago, 3 F.3d 225, 229 (7th Cir.1993); Butler v. American Trawler Co., 887 F.2d 20, 21 (1st Cir.1989); Taylor v. Kennedy Engine, Inc., 861 F.2d 127, 128-29 (5th Cir.1988); Parker v. Gulf City Fisheries, Inc., 803 F.2d 828, 829 (5th Cir.1986); Drake v. Raymark Industries, Inc., 772 F.2d 1007, 1015 (1st Cir.1985); Sperry Rand Corp. v. Radio Corp. of America, 618 F.2d 319, 321 (5th Cir.1980); Kelly v. United States, 531 F.2d 1144, 1146 (2d Cir.1976); 1 S. Friedell, Benedict on Admiralty § 172, at 11-31 (7th ed.1999) (see cases cited therein); 1 T. Schoenbaum, Admiralty and Maritime Law § 3-4, at 73 (2d ed.1994) (see cases cited therein).
Although case law clearly provides that the focus for determining location is not on where the alleged negligent conduct took place, courts have followed one of the two remaining interpretations with almost equal frequency. The approach focussing on the location of the damage or injury was annunciated by the Supreme Court in The Plymouth, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1866).[3] Many federal courts continue to follow this precedent, determining that the wrong is "located" where the injury or damage occurs. See, e.g., Mink, 29 F.3d at 1545; Taylor, 861 F.2d at 128-29; Parker, 803 F.2d at 829; Sperry Rand Corp., 618 F.2d at 321; Kelly, 531 F.2d at 1146.
Nevertheless, the Supreme Court refined the above locality requirement in The Admiral Peoples. 295 U.S. 649, 652-53, 55 S.Ct. 885, 886-87, 79 L.Ed. 1633, 1635 (1935); see 1 T. Schoenbaum, Admiralty and Maritime Law § 3-4, at 73 (2d ed.1994). As Professor Schoenbaum observes from The Admiral Peoples decision, the Supreme Court determined that "the `place of wrong[]' * * * is where the negligent party's act affects the victim."[4] 1 T. Schoenbaum, Admiralty and Maritime Law § 3-4, at 73 (2d ed.1994). The Supreme Court as well as many federal courts continue to follow this approach, interpreting the location of the tort as where it "took effect." See Grubart, 513 U.S. at 534, 115 S.Ct. at 1049, 130 L.Ed.2d at 1035 (Supreme Court focussed on where the accident or incident took place and not on where the damage occurred when it determined that Great Lakes' alleged tort must have been done on navigable water); *1127 Executive Jet Aviation, Inc., 409 U.S. at 254, 266, 93 S.Ct. at 497, 503, 34 L.Ed.2d at 459, 466 (reiterated the location test, asserting that the tort or wrong occurs where the alleged negligence "took effect" while also restating the location test as where the "accident" occurs); Victory Carriers, Inc. v. Law, 404 U.S. 202, 205, 92 S.Ct. 418, 421, 30 L.Ed.2d 383, 387 (1971) (tort occurs at the locality of the accident); Great Lakes Dredge & Dock, 3 F.3d at 229 (concluding that tort occurred when defendant drove piling into underground tunnel even though damage to victims occurred on land, away from river); see also Lauritzen A/S v. Dashwood Shipping, Ltd., 65 F.3d 139, 142 (9th Cir.1995); Butler, 887 F.2d at 21; Drake, 772 F.2d at 1012.
Either interpretation of where the tort occurred leads us to the same conclusion that the City's alleged negligence occurred on navigable water. This is true because the Extension Act makes any distinction between the two forms essentially an academic point under the allegations of this case. Plaintiffs allege that the City's negligence precipitated the incident, including, inter alia, failure to ensure Great Lakes knew where the tunnel was located and failure to ensure the new location where Great Lakes was to install the pilings was not over the tunnel. Plaintiffs further allege that the City was negligent in failing to repair the tunnel breach in a timely manner and in failing to warn the downtown merchants and building owners of the risk of flooding.
Under the approach that pinpoints the tort as where it "takes effect," it is clear that the City's alleged negligence culminated or took effect when Great Lakes drove the piling into the tunnel wall. Plaintiffs' allegations tightly intertwine the City's conduct within the chain of events causing the tunnel's breach. As such, it follows that the accidentthe breach of the tunnel walleffectuated the City's alleged negligent acts. Simply because Great Lakes provided the instrumentality does not change the fact the City's negligence was effectuated, or materialized, on the Chicago River when Great Lakes drove the piling into the tunnel wall.
Under the approach that pinpoints the location of the tort based on where the injury or damage occurs, the City's alleged negligence still satisfies the location test despite plaintiffs' damage occurring on land. Because a vessel was involved, the location of the damage is not limited to occurring on navigable waters, as the Extension Act expands the area where damage may occur inland past the shoreline. In Great Lakes Dredge & Dock, the seventh circuit squarely addressed the City's argument that locality could not be satisfied because most of the damage occurred on land far from the Chicago River and beyond a reasonable scope of temporal proximity. The court opined that this was not fatal, as "the Admiralty Extension Act provides that the admiralty jurisdiction `shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.'" Great Lakes Dredge & Dock, 3 F.3d at 229, quoting 46 U.S.C. App. § 740 (1994). Thus, plaintiffs have successfully alleged that the City's alleged wrong occurred on navigable water under both the "takes effect" and injury analysis. Therefore, plaintiffs satisfy the location test because the flood damage was caused by a vessel and because the alleged tort occurred on navigable water.

B. Connection To Maritime Activity
The determination of whether there is a sufficient connection between the wrong and maritime activity involves application of a two-prong test to the facts. First, the court must look to the general features of the incident involved and determine whether the incident had the potential to disrupt maritime commerce. Grubart, 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035. Then the court must determine "whether `the general character' of the `activity giving rise to the incident' *1128 shows a `substantial relationship to traditional maritime activity.'" Grubart, 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035, quoting Sisson v. Ruby, 497 U.S. 358, 365, 364 & n. 2, 110 S.Ct. 2892, 2897, 2896 & n. 2, 111 L.Ed.2d 292, 301, 301 & n. 2 (1990).
In this case, the trial court correctly found that the first prong was met. The Supreme Court described the incident in this case as "damage by a vessel in navigable water to an underwater structure." Grubart, 513 U.S. at 539, 115 S.Ct. at 1051, 130 L.Ed.2d at 1038. Clearly, this incident had the potential to disrupt maritime commerce on the Chicago River. In fact, the river remained closed for over a month, ceasing river traffic, stranding ferries, and preventing barges from entering the river. See Grubart, 513 U.S. at 539, 115 S.Ct. at 1051, 130 L.Ed.2d at 1038.
We also find that the allegations satisfy the second prong. To determine the substantial relationship prong, we must ask whether the general character of the tortfeasor's activity giving rise to the incident relates closely enough to activity traditionally subject to admiralty law to support the application of admiralty rules to the instant action. Grubart, 513 U.S. at 539-40, 115 S.Ct. at 1051, 130 L.Ed.2d at 1038. The trial court defined the City's activity as "contracting for and supervising a civic improvement" and concluded that "the ministerial acts involved in such a task are far from being central to maritime commerce." We disagree with the trial court's characterization of the City's activity in this case.
Although it cannot be said that Great Lakes' activityrepair or maintenance work on a navigable waterway performed by a vessel (Grubart, 513 U.S. at 540, 115 S.Ct. at 1051, 130 L.Ed.2d at 1039)is the same as the City's activity, the trial court overly generalized the City's "task" as a simple "civic improvement" while overlooking the unique responsibility that the City owes to those who navigate the Chicago River as well as the City's duty to protect persons and structures on the land next to the river. No matter which governmental entity is responsible for maintaining navigational aids and protective barriers in a major navigable waterway such as the Chicago River, the fulfillment of that responsibility is crucial for the continued safe passage of the waterway and safety of those people and structures abutting the waterway. It follows that execution of those duties substantially relates to maritime activity. Moreover, it is axiomatic that not every municipality bears the obligation of maintaining protective barriers around bridges in major navigable waterways. Consequently, we cannot characterize the City's activity in this case as simply a routine "civic improvement." Instead, we believe that the general character of the City's activity was that of fulfilling its duty in maintaining and replacing the piling barriers in the Chicago River and conclude that such activity substantially relates to traditional maritime activity.
In conclusion, we note that it is not altogether clear whether the City's alleged post-breach negligence in failing to repair the tunnel and failing to warn of the impending flood would, standing alone without the pre-breach allegations of negligence, satisfy the jurisdiction analysis. This potential issue, however, was not raised by the City or any other party to this appeal. Rather, the parties assume that the City's alleged pre-breach and post-breach negligence should be considered together as an interlocking chain of negligence. As such, we decline to address the potential impact of our observation. Moreover, we believe that, if there is any distinction between pre-breach and post-breach negligence that affects application of admiralty law, such an issue is more appropriately addressed during the apportionment of damages. See Parker, 803 F.2d at 829; Drake, 772 F.2d at 1015; Harville, 731 F.2d at 782. Therefore, we end our inquiry here having found that *1129 plaintiffs successfully alleged causes of action sounding in admiralty.[5]

VI. PREEMPTION OF ILLINOIS TORT IMMUNITY ACT
Before analyzing whether admiralty law applied to the plaintiffs' causes of action, the trial court observed that, if admiralty law did apply, the City's defense of immunity under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 et seq. (West 1998)) would be preempted. The City disagrees and contends that the Tort Immunity Act is not preempted unless it materially prejudices the characteristic features of the general maritime law or interferes with the harmony and uniformity of admiralty law. The City submits that plaintiffs have not shown how application of the Tort Immunity Act would run afoul of admiralty law. For the following reasons, we find the City's contentions unpersuasive.
Although a suit may not be maintained against a state unless the state has waived sovereign immunity under the eleventh amendment (U.S. Const., amend. XI), local governments are not shielded by the eleventh amendment and are generally liable in admiralty law for their torts. 2 T. Schoenbaum, Admiralty and Maritime Law § 20-3, at 457 (2d ed.1994). The leading case on this issue is Workman v. New York City, 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314 (1900). In Workman, a New York City fireboat collided with another vessel. Concluding that New York City was not entitled to immunity under state law, the Supreme Court reasoned that application of immunity in an admiralty case would "violate[] the imperative command * * * [that] admiralty courts must administer redress for every maritime wrong in every case where they have jurisdictional power over the person by whom the wrong has been committed." Workman, 179 U.S. at 563, 21 S.Ct. at 216, 45 L.Ed. at 321. As such, the Court refused to apply the state law providing for municipal immunity. Following Workman, courts have consistently reaffirmed that state immunity laws protecting local governments from liability are no defense to a maritime tort action. See Jacintoport v. Greater Baton Rouge Port Comm'n, 762 F.2d 435, 438 (5th Cir.1985) ("Although sometimes local governmental entities may be held to be an arm of the state and thereby enjoy the state's Eleventh Amendment immunity [citation], independent local political subdivisions are not entitled to that immunity even though they exercise a `slice of state power'"); Central Rivers Towing, Inc. v. City of Beardstown, 750 F.2d 565 (7th Cir.1985) (holding Illinois municipality liable under admiralty law); City of Chicago v. White Transp. Co., 243 F. 358, 358-59 (7th Cir.1917), cert. denied, 245 U.S. 660, 38 S.Ct. 60, 63 L.Ed. 535 (1917) (refusing to permit the City of Chicago to assert state-law immunity from tort liability in a maritime tort action arising from the alleged negligent operation of a city-owned vessel); Connone v. Transport Desgagnes, Inc., 976 F.Supp. 1111, 1113 (N.D.Ohio 1997) ("Courts in this jurisdiction have been no exception, adhering to the principle that claims of sovereign immunity born out of state law are no defense to a maritime tort action"); Pelican Marine Carriers, Inc. v. City of Tampa, 791 F.Supp. 845, 856 (M.D.Fla.1992) ("In the interest of uniform application of maritime law, federal courts exercising admiralty jurisdiction are not bound by local laws limiting liability of governmental agencies"); Principe Compania Naviera, S.A. v. Board of Commissioners, 333 F.Supp. 353 (E.D.La.1971) (Board of Commissioners of Port of New Orleans precluded from invoking defense of immunity to defend against maritime tort). Therefore, we conclude that application *1130 of the Tort Immunity Act in this case is preempted.

VII. COMMERCIAL UNION'S ASSIGNMENTS
Commercial Union contends that the trial court erroneously concluded that the assignments under which it maintains the instant action are invalid under admiralty law. For the following reasons, we agree.
Before delving into this issue, however, we explain the underlying course of events leading to it. Following the Great Chicago Flood, numerous downtown property owners and businesses, or their insurers (collectively, original plaintiffs) filed suits against the City and Great Lakes. Great Lakes settled with 36 of the original plaintiffs for $12,024,000. In separate settlement agreements, the original plaintiffs released Great Lakes from liability while also assigning all of their rights, titles, interests, and claims against the City to Great Lakes. Commercial Union funded the settlement on behalf of Great Lakes. In turn, Great Lakes assigned all of the rights, titles, interests, and claims against the City that it received from the settlement agreements to Commercial Union. Commercial Union then filed this action against the City as assignee of the original plaintiffs.
The trial court concluded that Commercial Union could not maintain the assigned action against the City under admiralty law. The trial court considered insurer Commercial Union as merely standing in the shoes of tortfeasor Great Lakes and read McDermott, Inc. v. AmClyde, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994), as proscribing the assignments. In effect, the trial court construed the assignments as a means of circumventing the Supreme Court's policy of allotting liability based upon each defendant's proportionate share of liability.
Commercial Union disagrees and directs our attention to federal case law where assignments, such as the ones at issue, conferred to a settling defendant the ability to sue a nonsettling defendant. In American Commercial Lines, Inc. v. Valley Line Co., 529 F.2d 921 (8th Cir.1976), owners of shore structures threatened to bring actions in personam against American Commercial Lines, Inc. (American). These potential actions came about as a result of damage to shore structures presumably caused by the negligence of two vessels, one owned by American and the other owned by Valley Line Co. (Valley). As the two ships were passing one another upon agreed ports, American's vessel collided with the shore structures. Suspecting liability, American paid over $33,000 in claims to the shore structure owners and obtained a release for its liability and an assignment of the potential claims against Valley. Distinguishing claims under assignments from those under subrogation, the court held that "American can sue as assignee of the claims of the shore owners." American Commercial Lines, Inc., 529 F.2d at 925. Other federal decisions similarly hold that a settling defendant may sue a nonsettling defendant under an assignment while other decisions acknowledge their existence without discussing their validity. See In re Incident Aboard the D/B Ocean King, 758 F.2d 1063, 1066 (5th Cir.1985) (tortfeasors sue co-tortfeasor as assignees of personal injury and wrongful death claims); The William C. Atwater, 110 F.2d 644, 646-47 (2d Cir. 1940) (allowing settling tortfeasor to pursue nonsettling tortfeasor on an assignment of claim, although describing the action as one of contribution); The Gulf Stream, 64 F. 809, 810-11 (2d Cir.1894) (limiting assignee's recovery against co-tortfeasor to co-tortfeasor's share of liability against the settlement amount); Claim of Gypsum Carrier, 465 F.Supp. 1050, 1063-64 (S.D.Ga.1979) (following The Gulf Stream and Atwater).
The City does not cite any applicable authority in opposition to these cases. Moreover, our reading of McDermott does not lead us to the same conclusion that the *1131 trial court reached. In McDermott, the Supreme Court decided the issue of "whether the liability of [a] nonsettling defendant[] should be calculated with reference to the jury's allocation of proportionate responsibility, or by giving the nonsettling defendant[] a credit for the dollar amount of the settlement." McDermott, 511 U.S. at 204, 114 S.Ct. at 1463, 128 L.Ed.2d at 154. Three considerations guided the Court in determining which approach to adopt. Those were to adopt an approach consistent with the proportionate fault approach in property damage cases that was annunciated in United States v. Reliable Transfer, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), to promote settlements, and to enhance judicial economy. The Court settled on the proportionate share approach. Under this alternative, the amount of settlement "`extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other tortfeasors by the amount of the equitable share of the obligation of the released tortfeasor.'" McDermott, 511 U.S. at 209, 114 S.Ct. at 1465, 128 L.Ed.2d at 156, quoting Restatement (Second) of Torts § 886A, Comment m, at 343-44 (1977). Consequently, "no suits for contribution from the settling defendants are permitted, nor are they necessary, because the nonsettling defendants pay no more than their share of the judgment." McDermott, 511 U.S. at 209, 114 S.Ct. at 1466, 128 L.Ed.2d at 157.
The trial court interpreted McDermott as providing that "no settling tortfeasor may maintain an action for contribution under admiralty law." This may be true, as one commentator on admiralty law has suggested: "Unstated, but implicit in the [McDermott] holding, is a similar bar against actions for contribution by settling tortfeasors who believe they have paid too much, because the non-settling defendants will always be responsible for their full proportionate share of plaintiffs damages." 2 R. Ziade, Benedict on Admiralty § 4, at 1-10 (7th ed.1995). Nevertheless, Commercial Union's suit under the assignments does not violate the unstated rule. Although this case resembles a contribution action in that a "defendant" (its insurer) is suing a codefendant on the basis of shared liability, the fact that Commercial Union is suing the City under assignments of the original plaintiffs' claims avoids any breach of the policies set forth in McDermott. If this were a typical contribution action, the City would have been held liable for its proportionate share of the liability resulting from the flood. In other words, the original plaintiffs would have continued their action against the City to its conclusion. Under this scenario, an action against the City brought by Commercial Union would offend the policies outlined in McDermott because the City could ultimately be held accountable for more than its proportionate share of liability.[6]
Conversely, in this case the City has yet to be held liable for its proportionate share of liability, let alone any degree of liability. Commercial Union stands in the shoes of the original plaintiffs, suing on the same claims original plaintiffs would have been suing on, but for the assignments. Commercial Union's suit therefore effectively continues original plaintiffs' suit seeking an award based on the City's proportionate share of liability. Consequently, the policy of not holding a nonsettling tortfeasor liable for more than its proportionate share of liability will not be breached.
We are aware of the trial court's and the City's concern that permitting a settling defendant to sue a nonsettling defendant not only gives the settling defendant the opportunity to recover the cost of the settlement, but also to profit from its wrong. *1132 This concern, however, may be addressed by proportioning the award to ensure that each tortfeasor, at the end, pays their equitable share.
In The Gulf Stream, 64 F. 809 (2d Cir.1894), the settling defendant paid plaintiffs $1,150 to settle claims totaling $3,350 while also receiving an assignment of the remaining claims plaintiffs maintained against the nonsettling defendant. When the settling defendant's suit against the nonsettling defendant concluded, the court limited the settling defendant's recovery to the nonsettling defendant's share of liability as applied to the amount of the settlement rather than awarding the amount that the original plaintiffs could have recovered.[7]The Gulf Stream, 64 F. at 811; accord The William C. Atwater, 110 F.2d at 646 (following The Gulf Stream); Claim of Gypsum Carrier, 465 F.Supp. at 1064 (following The Gulf Stream). Consequently, nonsettling defendant shared the cost of the settlement in proportion to its liability. Similarly, we believe that apportioning the cost of settlement according to the parties' proportionate fault most aptly prevents the assignments from violating the policies and law annunciated in McDermott.[8]
In fact, when an equitable distribution of liability based on the settlement amount is achieved at the conclusion of this case, we believe that our decision complements the goals the Supreme Court sought to achieve when it adopted the proportionate share approach. The first goal of being consistent with Reliable Transfer is clearly satisfied. In Reliable Transfer, the Supreme Court "replaced the divided damages rule, which required an equal division of property damage whatever the relative degree of fault may have been, with a rule requiring that damages be assessed on the basis of proportionate fault when such an allocation can reasonably be made." McDermott, 511 U.S. at 207, 114 S.Ct. at 1465, 128 L.Ed.2d at 156. In this case, we reach essentially the same result under The Gulf Stream. Simply put, the City and Commercial Union, at the end, will be held liable for a portion of the settlement amount based on their proportionate fault.
The instant arrangement likewise satisfies the second goal of promoting settlements. Presumably, original plaintiffs extracted sufficient funds from Great Lakes to release their claims against it. More importantly, one could strongly infer that original plaintiffs felt sufficiently whole and satisfied to assign their claims against the City to Great Lakes (which in turn assigned them to Commercial Union). It appears that this arrangement reimbursed original plaintiffs for their damages more efficiently than if they continued with their suit against the City while only settling with Great Lakes. Moreover, it can be easily inferred that Great Lakes was more motivated to settle knowing that it could recover some of the cost from the City. Thus, the goal of promoting settlements is satisfied.
As to the third goal, Commercial Union's litigation of the assigned claims imposes no extra burdens upon the judiciary *1133 than if the original plaintiffs continued their actions. See Hartford Casualty Insurance Co. v. Argonaut-Midwest Insurance Co., 854 F.2d 279, 282 (7th Cir.1988) (stating that an assignment claim presupposes that the claim has not been paid; the entire claim is transferred to another party who prosecutes the claim in shoes of the assignor). No matter who the plaintiffs are, the City's refusal to settle has forced the parties to litigate. As such, it cannot be said that the assignments offends this policy.
The City contends that Illinois' Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/1 et seq. (West 1998)) should apply in this case and that, because the policy behind the Contribution Act forecloses the assignments at issue, Commercial Union cannot maintain this action. If we lacked admiralty rules and policies regarding proportionate share liability and contribution to guide us in this case, application of the Contribution Act might have been necessary. Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 314-16, 75 S.Ct. 368, 370-72, 99 L.Ed. 337, 342-44 (1955). However, as seen from our discussion above, that is not the case. Consequently, to apply an Illinois scheme of law and polices in an area where admiralty principles have been established would interfere with the uniform application of admiralty law.[9] See American Dredging Co. v. Miller, 510 U.S. 443, 447-50, 114 S.Ct. 981, 985-87, 127 L.Ed.2d 285, 293-95 (1994); Kossick v. United Fruit Co., 365 U.S. 731, 733-42, 81 S.Ct. 886, 889-94, 6 L.Ed.2d 56, 59-65 (1961); Wilburn Boat Co., 348 U.S. at 314, 75 S.Ct. at 370, 99 L.Ed. at 342-43; Workman v. New York City, 179 U.S. 552, 558, 21 S.Ct. 212, 214, 45 L.Ed. 314, 319 (1900); Kiernan v. Zurich Co., 150 F.3d 1120, 1121 (9th Cir.1998); State of Louisiana ex rel. Guste v. M/V Testbank, 752 F.2d 1019, 1031-32 (5th Cir.1985); Becker v. Crounse Corp., 822 F.Supp. 386, 390 (W.D.Ky.1993). This is especially true if, as the City contends, application of the Contribution Act and its underlying policies would lead to a different result.[10] Thus, we conclude that the Contribution Act is preempted.

CONCLUSION
For the reasons discussed above, we reverse the circuit court of Cook County. Specifically, we reverse the dismissal of the class plaintiffs' complaint, the dismissal of Mary Sims' complaint, and the denial for leave to file Commercial Union's amended complaint. We remand these causes to the circuit court of Cook County for further proceedings consistent with this opinion.
Reversed and remanded.
GORDON and McNULTY, JJ., concur.
NOTES
[1] The trial court also held that Commercial Union could not maintain the action under Illinois law since the assignment violated the public policy underlying Illinois' Joint Tortfeasor Contribution Act (740 ILCS 100/1 (West 1998)). This issue we do not reach, as we find admiralty law controls in this case.
[2] We have concurrent jurisdiction to consider admiralty claims pursuant to the "saving to suitors" clause which was first provided by the Judiciary Act of 1789. The modem version is found at 28 U.S.C. § 1333(1) (1994). It is well settled that, under the "saving to suitors" clause, we may adjudicate maritime claims in proceedings in personam pursuant to federal admiralty law and apply state law so long as it does not "work[] material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." American Dredging Co. v. Miller, 510 U.S. 443, 447, 114 S.Ct. 981, 985, 127 L.Ed.2d 285, 293 (1994); accord 1 S. Friedell, Benedict on Admiralty § 123, at 8-9 through 8-10 (7th ed.1999); 1 T. Schoenbaum, Admiralty and Maritime Law § 3-2, at 60-61 (2d ed.1994).
[3] In that case, the Supreme Court held that "the wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction." The Plymouth, 70 U.S. (3 Wall.) at 35, 18 L.Ed. at 128; see Executive Jet Aviation, Inc., 409 U.S. at 253, 93 S.Ct. at 497, 34 L.Ed.2d at 459. The Court reasoned that the negligence itself cannot be the place of wrong because that is damnum absque injuria. The Plymouth, 70 U.S. (3 Wall.) at 36, 18 L.Ed. at 128; 1 T. Schoenbaum, Admiralty and Maritime Law § 3-4, at 72 (2d ed.1994).
[4] In that case, the plaintiff fell and suffered serious injuries when she stepped from the vessel's gangplank to the dock. While the gangplank was partially equipped with rope railings, plaintiff alleged that defendant was negligent for failing to provide those railings to the end of the gangplank where it met the dock, failing to have the gangplank flush with the dock, and failing to give an adequate warning. Although plaintiff's injury occurred or was consummated when she fell onto the dock, the court reasoned that this was not important since the action arose from negligence that affected the plaintiff while she was still on the vessel. The Admiral Peoples, 295 U.S. at 652, 55 S.Ct. at 886-87, 79 L.Ed. at 1635.
[5] Having found that admiralty law applies to this case on the basis of a maritime tort, we need not consider plaintiffs' argument that admiralty jurisdiction could be established alternatively on the basis that the contract between the City and Great Lakes was maritime in nature.
[6] Moreover, Commercial Union could not bring a contribution action against the City even if it paid more than its proportionate share of liability under the settlement agreement. This reflects the policy decision to place the risk of overpayment upon the tortfeasor. See McDermott, 511 U.S. at 219, 114 S.Ct. at 1470-71, 128 L.Ed.2d at 162-63.
[7] At the time The Gulf Stream was decided, co-tortfeasors divided the liability equally. In Reliable Transfer, however, the Supreme Court replaced the divided damages rule for allotting liability between multiple tortfeasors with today's scheme, which allots liability based upon each tortfeasor's degree of fault.
[8] This assumes that the settlement amount is less than a fact finder's damage award. However, where the settlement amount exceeds the damage award, we believe the policy underlying the proportionate share approach mandates that the nonsettling tortfeasor pay no more than his proportionate share of liability as applied to that award. See McDermott, 511 U.S. at 212-13, 221, 114 S.Ct. at 1467, 1471-72, 128 L.Ed.2d at 158-59, 164. Consequently, a nonsettling defendant will not be penalized and required to pay more than its proportionate share of liability as determined by the fact finder simply because a settling defendant made a poor decision and paid a settlement amount that was larger than the fact finder's damage award. This respects the policy that a settling defendant should bear the risk of over compensating the plaintiff by its settlement.
[9] It is worth noting that the Contribution Act codifies one of the pro tanto approaches rejected by the Supreme Court in McDermott. Compare 740 ILCS 100/2(c)(d) (West 1998) with McDermott, 511 U.S. at 208, 217, 114 S.Ct. at 1465, 1470, 128 L.Ed.2d at 156, 162.
[10] At least one district of the Illinois Appellate Court has found a similar assignment invalid as violative of the Contribution Act. See Dubina v. Mesirow Realty Development, Inc., 308 Ill.App.3d 348, 356-357, 241 Ill.Dec. 681, 719 N.E.2d 1084 (1999).